#### IN THE

# SUPREME COURT OF ERRORS

#### OF THE

## STATE OF CONNECTICUT.

<hr/>

### Hood against the New York and New Haven Railroad Company.

The defendants, at the time specified in the declaration, were running their cars, as common carriers, from N. H. to P., five miles short of C., their liability ending at P., except as resulting from stage carriage beyond P. They had given public notice, by advertisement in the newspapers, that the cars on their road from N. H. would arrive at P., and stages would leave P. for C., at the times specified in such notice. The plaintiff bought of the defendants a ticket for the fare from N. H. to C. The injury complained of happened in the stage between P. and C. The defendants did not own or control the stage, nor participate in the profits of its use. In an action founded on a special contract to carry the plaintiff safely from N. H. to C., by railroad and stage, it was held, that the advertisement implied no liability of the defendants beyond the line of their road, and the ticket showed only the receipt of so much money paid by the plaintiff, which was all that he was to pay, previous to his arrival at C; and consequently, the undertaking alleged was not proved; therefore, a verdict for the plaintiff was set aside as against the evidence. [Two judges dissenting.]

Hood *v.* New York and New Haven Railroad Company.

There is a difference between freight and passengers as to the liability of the carriers.

Charter power, express or implied.

Estopped by matter *in pais.*

Agency.

Exceeding authority.

THIS was an action, founded on a special contract of the defendants, to carry the plaintiff safely, by means of railroad cars and stages, from the town of New Haven to the village of Collinsville.

The declaration, after stating the undertaking of the defendants, alleged, that on the 15th day of January, 1850, while the plaintiff was a passenger, to be conveyed, by the defendants, upon the route from New Haven to Collinsville, it became and was the duty of the defendants to use proper care, in safely and securely conveying the plaintiff, by means of said cars and stages, from New Haven to Collinsville; yet the defendants, not regarding their undertaking, did not use proper care, but before the plaintiff had arrived at the terminus of said route in Collinsville, *viz.*, at Farmington, they negligently, carelessly and unskillfully caused him to be placed in a certain sleigh, or carriage upon runners, for the purpose of conveying him over the remaining part of said route; and through the carelessness, negligence and unskillfulness of the defendants, and their servants and agents, said sleigh, or carriage upon runners, was overset, and thrown upon its side; by means whereof, the plaintiff, being therein, was severely and dangerously wounded, bruised and injured, and one of his legs was crushed, and the bones thereof were broken, in divers places, and its arteries ruptured; and, by means of the premises, the plaintiff became and was lame, and disordered, and so continued, for a long space of time, &c.

The defendants pleaded the general issue; upon which the case was tried, at New Haven, October term, 1851.

On the trial, the plaintiff gave in evidence, 1. the charter of the defendants; 2. the lease from the New Haven and Northampton Company to the defendants; 3. an advertisement, printed in the *Columbian Register*, a newspaper in New Haven, published from 1849 until after the injury complained of, which was in these words :

### "CANAL RAILROAD.

#### WINTER ARRANGEMENT.

On and after Thursday, November 15, passenger trains will run daily, (Sundays excepted,) as follows :

Leave New Haven for Farmington, at 7.30 A. M., 11.15 A. M., and 3.50 P. M.

Leave Farmington for New Haven, at 8 A. M., 11.15 A. M., and 3.30 P. M.

Freight trains will leave New Haven, at 1 P. M., and Farmington, at 12.30 P. M.

The 8 A. M. and 11.15 A. M. trains from Farmington *connect with the* 9.45 A. M. and 12.50 trains for New York.

#### *Stages.*

Leave Hitchcock's at 12.05 P. M. for Waterbury.

Leave Plainville, at 12.22 P. M. for Bristol, Terryville, Plymouth, Northfield and Litchfield.

Leave Farmington, at 12.30 P. M. for Unionville, Collinsville, New Hartford and Winsted.

NEW HAVEN, Nov. 15th.

Signed,                    *R. B. Mason, Supt.*"

4. The testimony of the plaintiff, which was as follows : That on the 15th day of January, 1850, he bought, at the depot of the defendants in New Haven, at the ticket office, and of the ticket-master of the defendants, a ticket, to go to Collinsville. That Mr. Goodrich, the ticket-master, told him, in answer to his inquiry, that the ticket would take him through to Collinsville. That he took a seat in the cars, and rode to the Farmington station; that they were

there detained about two hours, waiting for a train bringing stockholders of the Canal Railroad from the north, whither they had made an excursion.    That the engine of the train in which he was, gave out, and the engineer of the other train backed the passengers up to Barnes's, and at Barnes's, the passengers were ordered to take the stage; that he took a seat in the stage ; and that, while on the way from Barnes' to Collinsville, the stage was upset, and the injury took place.    He further said, that on the way from New Haven to Plainville, the conductor in the cars took the ticket which he had purchased at New Haven, and gave him another ticket, which he produced, and was as follows :

"New Haven and Northampton Company.
Conductor's Ticket.
New Haven to Collinsville, by Stage from Farmington.
*O. D. Goodrich,* Conductor."

That he could not recollect, particularly, what was on the original ticket, but he believed it was substantially the same as on the one produced.    That the distance from Barnes's to Collinsville, was about two and a half miles.

5. The testimony of O. D. Goodrich, which was as follows :

" In January, 1850, I was, and am now, a conductor on the Canal Railroad, between New Haven and Farmington, in the employment of the defendants.    The ticket exhibited is signed by me, as conductor : it is an exchange ticket. The ticket got at the station, is exchanged in the cars for this, and the other given up.    The New York and New Haven Railroad Company had the control and use of the Canal Railroad to Plainville only.    The trains run through to Farmington.    The stages were said to belong to Waterman & Jones.    I know nothing of the contract between the proprietors of the stages and any one else.    I know they were in the habit of taking up passengers from the cars.    I can't

tell how the original ticket was worded; I think it read, 'From New Haven to Collinsville.' The ticket in exchange for which this was given, must have been through to Collinsville."

On cross-examination, he said, "The tickets were got up by the New Haven and Northampton Company. No change had been made in them. The other ticket would correspond with the one shown. I can not tell when the change of tickets was made, but it was after April 1st, 1850. The New Haven and Northampton Company ran cars up beyond Plainville. The New York and New Haven Company had nothing to do with these, or the stages, to my knowledge. I think the cars belonged to the New Haven and Northampton Company. I don't know anything about any arrangements with the stage company."

6. The testimony of E. M. Goodrich, who testified as follows:

"I was the ticket agent at the New Haven station for the New York and New Haven Railroad Company from 28th of December, 1848, to April, 1851, with the exception of three months in 1849. In January, 1850, the cars were run to Plainville, by the New York and New Haven Railroad Company, under lease, and continued on, by sufferance—a mutual arrangement, as I understood—to Farmington. In regard to cars going any further, I can't say, only that we ticketed through to Collinsville, using the old tickets of the New Haven and Northampton Company, till the spring or summer of 1850; we used the old tickets as a matter of convenience, and being hurried in business, continued to use them. But it was contemplated, all the while, to get new tickets. The ticket read, 'From New Haven to Collinsville, by Railroad and Stage.' It was expected this ticket would be given up by the passengers, and a conductor's ticket given in lieu of it. The conductors were furnished with checks to exchange, by the secretary of the New

York Company. I was in the habit of receiving the pay through to Collinsville, $1.25, and the stage proprietors ticketed through the other way, giving tickets good for the passage through, which were taken by the New York Company. We settled once a month; the settlement was made with me, as the agent of the New York Company. I do not recollect the proportion in which the money was divided between the cars and stages. The stage proprietors held the conductor's checks as vouchers for the number of passengers taken from our cars and carried by them in their stages, and we held the through tickets given by the stage proprietors at their end of the route, as vouchers for the number of passengers taken from their stages and carried in our cars. The balance was paid over, and we sent the avails once a month to the Treasurer's office in New York, with a transcript of the accounts. The balance usually was in our favor. The sales of tickets were reported, and my collections were sent to the office in New York daily. A memorandum of the proportionate rates of division between the company and the stage proprietors was given me, at the time, by Mr. Mason, the superintendent of the New York Road."

On cross-examination, he testified:

"Whatever we had agreed upon as the rate of division, was the basis of settlement. We took the whole fare one way, and the stages the other. The division was from Plainville, on our part. We had nothing from above; the stage folks had that. A little reduction from the local fare to Farmington was made, if they went through to Collinsville. I am very confident Mr. Mason either made out the memorandum himself, or dictated it to me, in my office at the station-house in New Haven. I knew of the stage proprietors going to Bridgeport more than once to confer with Mr. Mason about this arrangement. We made no change in our arrangements with the stage company. After the

Hood *v*. New York and New Haven Railroad Company.

cars went to Barnes's, we had nothing to do with it. The road was not finished above Plainville, which is about five miles from Collinsville, but continued to settle as if the stages run from Plainville. If the Canal Company operated beyond, they did so by arrangement with the stage proprietors. I know of Mr. Mason's assenting particularly to the cars going up to Unionville, but there was no regular arrangement for pay. I knew the Canal Company were using cars above Plainville to Unionville. They were building the upper part of their Road to Collinsville. Freight was way-billed, and delivered by the New York cars at Unionville. We allowed the stage proprietors for fare from Plainville; had nothing to do with carrying passengers in the cars beyond. A. R. Gillmore, of New York, had the entire management of the ticket department. For a short time in the fall, the tickets on this road were sent to New York; but at Mr. Gillmore's request, I assumed the business of managing this part of the ticket business. I heard no objection to the stage tickets, till the winter or spring of 1850. After the accident, he said, in getting out new tickets, he should leave off about the stages."

On direct examination, he said, " If you only went to Farmington, the fare, I think, was a dollar ; to a through passenger, taking the stage, the fare to Farmington was a little less. I was temporarily manager of this part of the ticket department at New Haven, at Mr. Gillmore's request. I supplied the tickets, and they were returned to me."

To all this evidence, and to each portion of it, the defendants objected, on the ground that it did not prove, or conduce to prove, the contract set forth in the plaintiff's declaration. But the court admitted the evidence ; and the plaintiff offered no further testimony on this point.

The defendants were duly notified to produce their contract with the stage proprietors : they denied there was any.

The only evidence offered by the defendants in relation

to the allegations in the declaration regarding any contract therein set forth, was the testimony of Harmon L. Jones, who testified, upon this part of the case, as follows:

"In the winter of 1849–50, I was concerned in running a stage to the Canal Railroad. I was one of the proprietors. D. B. Waterman was the other. There was no arrangement made between the defendants and me. Whatever arrangement, if any, there was, had been made with Waterman before I became a proprietor· I knew of none. I bought in, in October, 1849. We took no pay, except for the distance we carried. If they brought ever so many to Farmington, and they stopped there, we would have none of the money."

The defendants thereupon prayed the court to instruct the jury, that if the facts were as testified to by the plaintiff's witnesses, and as shown by the plantiff, he was not entitled to recover; for that, as the defendants claimed, they were not authorized, under their charter, to make, and could not make, any contract to carry passengers by stages, in continuance of the railroad from Plainville to Collinsville, and particularly to make such a contract as that set up in the plaintiff's declaration. And prayed the court so to instruct the jury.

The court charged the jury, *pro forma*, that they might consider the evidence before them.

If they were satisfied from the evidence, there was such a contract, and, if they further found, it had been broken, through the negligence of the defendants, and thereby the plaintiff was injured, as claimed by him in his declaration, the plaintiff was entitled to recover, but otherwise not.

And thereupon the jury returned a verdict for the plaintiff, to recover 3,400 dollars.

The defendants, conceiving that the court erred, in admitting the evidence, and in charging the jury, and believing that the verdict in the cause was manifestly contrary to the evidence therein, moved for a new trial.

Hood *v.* New York and New Haven Railroad Company.

*R. I. Ingersoll* and *Baldwin,* in support of the motion.

*C. A. Ingersoll* and *Dutton,* contra.

ELLSWORTH, J.   This is an action founded on a special contract to carry the plaintiff from New Haven to Collinsville, by railroad and stage.   The defendants are not sued as common carriers, (the best mode, when practicable,) but upon the particular contracts described in the plaintiff's declaration.

Three questions are made, each of which has been argued with unusual learning and ability, and we are doubtless put in possession of all the important cases upon the subject, in the American or English reports.   The jury, having returned a verdict for the plaintiff, under a *pro forma* ruling of the court, as to the defendants' capability to contract, we are asked, by the defendants, to grant a new trial, because, *first,* the jury have found the existence of a contract against evidence ; *secondly,* if, however, such contract was indeed made, then they insist, that the defendants' agents exceeded their powers ; *thirdly,* are the defendants at liberty to avail themselves of this objection in their defense ?

Upon the first point, a majority of the court are satisfied, that the verdict is wrong.   It is true, there was some evidence of a promise; enough, perhaps, to make a slight *prima facie* case ; but the supposed promise is disproved, as soon as all the facts are brought to light.

We assume as true, as both parties concede it, that the defendants were in fact running their cars as common carriers, only over the canal road from New Haven to Plainville, (which is some five miles short of Collinsville,) under a lease of the canal company of their road from New Haven to that point ; and that they were under no responsibility beyond this, unless they are made responsible for the stages, by reason of a promise.

It should be our aim, in interpreting the acts of the parties, to see how they understood them themselves. Did they understand, that there was any other contract than what is implied from the defendants being common carriers to Plainville? There was certainly no express contract for more; and we think one can not be implied from the circumstances detailed in the motion. The defendants insist, that these circumstances do not prove any special or unusual undertaking on their part, but are entirely compatible with their being common carriers only to Plainville.

At the outset, then, we should not have expected the company to be entering into special contracts outside of their charter. They had advertised, and were publicly known, to be common carriers, throughout the line of their road. They insist, this was all they gave notice of, and that it was all for which they were paid; that they never took anything for stages diverging from their road, and did not hold themselves out, in any such character. They insist, that when the passengers arrived at a depot where they were to leave the cars, they well knew, that the appropriate duties of the defendants were at an end; and they did not suppose the defendants had undertaken for anything more.

Two circumstances have been urged by the plaintiff's counsel, to prove there was something more—*viz.*, the advertisement in the *Register*, a newspaper published in New Haven, and the ticket given the plaintiff, at the depot, accompanied with the payment of the fare from New Haven to Collinsville. The advertisement is in this form:

## "CANAL RAILROAD.

### WINTER ARRANGEMENT.

On and after Thursday, Nov. 15, passenger trains will run daily, (Sundays excepted,) as follows:

Leave New Haven for Farmington, at 7.30 A. M., 11.15 A. M., and 3.50 P. M.

Leave Farmington for New Haven, at 8 A. M., 11.15 A. M., and 3.50 P. M.

Freight trains will leave New Haven at 1 P. M., and Farmington, at 12.30 P. M.

The 8 o'clock A. M. and 11.15 P. M. trains from Farmington, connect with the 9.45 A. M. and 12.50 P. M. trains for New York.

*Stages.*

Leave Hitchcock's, at 12.5 P. M., for Waterbury.

Leave Plainville, at 12.22 P. M., for Bristol, Terryville, Plymouth, Northfield and Litchfield.

Leave Farmington, at 12.30, for Unionville, Collinsville, New Hartford and Winsted.

New Haven, November 15.

*R. B. Mason,* Supt."

There is here no contract in form; nor was the notice ever tendered to, or received by, any one, as a contract: it is a mere notice to the public, that the defendants are running passenger and freight cars, as common carriers, from New Haven to Plainville, and that beside this, there *are* stages leaving the road at the several points mentioned. Not an intimation is given, that the stages belong to the defendants, or are to be run by them; or that they have any connection with them, beyond the simple fact, that passengers, on arriving at these points, will not be left in the street, but that there are regular conveyances by stage, in which they can pursue their route. Of the thousand railroads in this country, there is not one, perhaps, which does not publish a like notice; and yet no one of them ever supposed, that such notices constituted contracts of the character and responsibilities claimed by the plaintiff. Nor are passengers deceived by such notices. They and the public know, from the character and general business of a railroad company, as well as from its appropriate name, that it is limited

in its territorial extent, and is not clothed with power to conduct its business, as if it had unrestricted attributes. We have no idea that this plaintiff was in fact deceived. He must, or might have known, that the defendants' road stopped at Farmington. Indeed, the notice says so ; and he knew, if he made any inquiry, the fare he paid them for carrying him on their road, and what he paid, or would be obliged to pay, to the stage proprietor there, or elsewhere, for traveling beyond the railroad.

Nothing then can be more unjust or unnatural, or more against common sense, than the perversion of a newspaper notice of this character into a special undertaking, that the defendants have set up lines of stages, over which they really have no control, and for a distinct business, foreign to the objects of their charter.

Nor can more be inferred from the ticket handed to the plaintiff at the New Haven depot. This is its form :

" NEW HAVEN AND NORTHAMPTON COMPANY.
Conductor's Ticket.
New Haven to Collinsville, by stage from Farmington.
O. D. GOODRICH, Conductor."

This ticket expresses no contract. Taken in connection with the payment of the money for the entire distance, it would furnish some evidence of a promise to transport the holder of the ticket over the entire line. But when it is seen, that the company have no connection with the stages, and that, for the convenience of the public, each party simply takes the entire fare, the inference that a special contract was made, is mere presumption. The ticket is obviously nothing more than a receipt of so much money, which the passenger takes to show throughout the line, to prove that he has paid all he is to pay, and may pass on, undisturbed. It is, too, a convenient practice to the railroad company, as a mode of keeping their accounts with

their conductors or the stage owners. One company receives nothing for the services, or expenditures or risks of the other; nor is there a participation in profits; nor a partnership; nor joint obligation; nor joint control. Each attends exclusively to his own appropriate business; the railroad company to the railroad, and the stage company to the stages. Nor are the public in the least deceived. All well know the object of paying the whole fare at once; and no intelligent man ever read the conductor's certificate to mean more than this. Indeed, the payment of the money at either end of this route, or in the middle, or at different places, can mean nothing in particular, more than that the passenger has paid all his fare, and may treat the railroad company as common carriers over their road, and the stage company as common carriers over theirs. Otherwise, if the passenger gets in at Collinsville, or New Hartford, or Litchfield, to go to New Haven, and pays the entire fare, there is a special contract got up with the stage company, and the railroad company are their servants and agents; and so, *vice versa*, as the passenger takes his seat, at one or the other end of the line. In traveling south, he contracts with the stage company; in traveling north, with the railroad company. And if a person in Montreal or New York pays his fare through, from one *terminus* to the other, he is, upon this hypothesis, to be held to have made his contract with the company in Canada, in the one case, and with the company in New York, in the other, and perhaps not at all with the intermediate companies. This is far from the truth. The public on the contrary are interested in holding each individual throughout the route to be *principals*, liable, as common carriers, on their respective roads. Nor is it true, nor has it ever been understood to be so, that paying the money at once, of necessity, proves an intention to change the character of the intermediate companies, or to exempt them from their usual liabilities. One pays his fare before taking

his seat; another when called upon; another pays each
company as he travels on; another pays, and takes no tick-
et. Are not all to be treated alike? Do not all enjoy the
same privileges and immunities? And is not each company
liable for the negligence of its agents? Between Montreal
and New York, there are some six railroad companies, and
one or more steamboat companies on lake Champlain.
Does any one dream, that the persons just alluded to, paying
at different places, pass on these roads and on the lake,
under different securities? Nor does the fact that separate
tickets may be taken at first, as is sometimes done, for each
portion of the route, or one entire one, specifically embracing
a ticket for each portion slit up for that purpose, so that the
attachment is very slight, make any difference. We are
confident, that these different modes of doing the same thing,
do not prove different contracts between the parties. In all,
the single or separate payments are only *payments*, and
nothing else.

We think, then, the jury should have looked beyond the
slight *prima facie* case, to the real facts in proof, and they
could not possibly have believed in a special contract, as
claimed by the plaintiff.

Nor do we see any reason why the defendants may not,
if this be all, show these facts in their defense. The con-
tract being one of inference, the whole evidence must be
looked at, to learn the truth.

We are aware, that in the cases cited from the English
books, it seems to be held, that if a railroad company re-
ceives, at its depot, goods marked to be forwarded beyond
its own road, and even beyond any other railroad, this is
*prima facie* evidence of a contract to carry the goods to the
place of destination. We will not say, that in these English
cases, since there was no evidence on the part of the de-
fendants to disprove the *prima facie* case, the defendants
were not rightly subjected in damages, for a loss beyond

Hood *v.* New York and New Haven Railroad Company.

their road.  Indeed, the judges intimate, that there may have been a partnership throughout the route.

But if more than this is meant, and that a railroad company, by receiving freight, at its depot, became responsible to carry it, as it were by guaranty or insurance, to the place of destination, at any distance from the road, and that this is an inference, which cannot be disproved by showing the facts, as in this case, we are not prepared to give it our assent.  We think it an unnatural inference, and a contract not of course to be drawn from the fact, that a chartered company, of limited extent, has taken goods to carry over its road.

But if we are wrong in this, it does not follow, that the doctrine of the English cases, as to *freight*, is to be applied to *passengers*.  Passengers take care of themselves.  And even as to freight, were such a question before us, we believe the true doctrine to be this : where goods are delivered to a carrier, marked for a particular destination, without any directions as to their transportation and delivery, save such as may be inferred from the marks themselves, the carrier is only bound to transport according to the established usage of business in which he is engaged, whether the consignor knew of the usage or not.  The carrier becomes a mere forwarder of the goods to the end of his own portion of the route, and is then bound to use due diligence in seeking for, and handing over the goods to, the next carrier.  The case of *Weed* v. *Saratoga & Schenectady R. R. Co.*, 19 Wend. 534, which was so much pressed upon us, is not unlike the English cases cited from Meeson & Welsby, and the English L. & Eq. R., which have been commented upon.  It is a *prima facie* case merely ; and the court say, there might be, and probably was, an agreement between the companies to be jointly interested in the profits of the entire route.  This is the view taken of that case by the court in New York, in *Vansantvoord* v. *St. John*, 6 Hill, 157.

Having decided to grant a new trial, for the reasons already stated, we are under no necessity of passing absolutely upon the remaining questions. They have not, therefore, received the attention which their importance demands. We will, however, remark, that it may well be doubted, if the directors have not exceeded their authority. Certainly, the authority is not specifically given in the charter; nor is it incident to any specific power which is given; nor is it an incidental power, within the objects of the charter. This distinction between a direct and an incidental power, though universally admitted, is not always easy of application. A temporary stage to carry passengers round a bridge which has been destroyed, or around a break in the road, we can see, is properly enough called incidental; for this is, in effect, the use of the road, a part of the transportation itself; but it is not so with independent and regular lines of stages, running from the depots of the road to towns lying at a great distance from it, as Litchfield, Plymouth, New Hartford, &c. It is the same with the stage to Collinsville, though a road was then being made. The defendants did not carry passengers beyond Plainville. This was the *terminus* of their road. It would be absurd to hold, that the directors, under the idea of incidental power, might do everything which they thought would bring passengers on to their road. Such a limit is no limit. If they could do this, under such a pretense, they could, by direct appropriation of the company's funds, build manufacturing villages along the road, and run steamboats to New York, in connection with their road, for this might increase their business. An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has a slight or remote relation to it. Stages and steamboats are not such. They are unnecessary in running cars over a railroad.

The reason why no railroad company, or any other chart-

ered company, can *exceed* their charter power, is elaborately discussed, and the true principle adjudged, over and over again, in the numerous cases cited at the bar. The books are full of such cases; and as an abstract question, nothing is better settled, or settled on better grounds, than the foregoing limitations and restrictions upon stockholders and directors of chartered companies. To these cases we refer, without particularly naming them. They hold, that a chartered company is, in this particular, analogous to a partnership, formed for definite purposes, and under written articles of association. The charter is the article of association, pointing out the objects and the manner of accomplishing the end. This limit, when ascertained, is the law of the company, equally obligatory on the stockholders, the directors, and their agents.

The third question remains to be noticed; and upon it, we make a few remarks, although we need not. Can the company avail themselves of this defence, the contract having in fact been made? It is said, if this can be done, it will enable the defendants to practice a fraud upon the public, and to do what is not permitted to others. This is a point of great practical importance in this class of cases, although if the opinion already expressed is correct—*viz.*, that the facts proved do not furnish evidence of a promise, it is here of less interest. It may well be questioned, whether the plaintiff was induced to pay the entire fare at the defendants' depot, and take his seat in their car, under any belief or implicit assurance, that the defendants undertook that *they* were running the stages, or would be responsible for their safe management; or that the plaintiff would have omitted to go to Collinsville, or to do just as he did, had he been told the two companies were not connected, and were not to be held responsible, the one for the other. If so, the question of estoppel can not arise; for it is of the essence of

an estoppel, that the representation should have influenced the individual setting it up.

As a principle of law, we are not prepared to say, that incorporated companies can of course repudiate the contracts of their agents, made with strangers, under confidence inspired by open and continued acts. Perhaps the same rule of law would be applied in cases of this kind, as in other agencies, which is, that a principal may be estopped, by reason of his conduct, and sometimes by his silence even. The law itself is clear; but its application is not always easy. We will not say how it is in this class of cases.

The cases read from the American books are chiefly where a *stockholder* of a company has, by injunction, prevented the company from embarking in enterprises foreign to the objects and purposes specified in the charter. So far, there is no difficulty. A stockholder can prevent his fellow-stockholders, as he can an ordinary partner, from transcending the powers of the charter. And so far has this remedy been extended in England, that their courts will not suffer the company to expend their money in petitioning parliament for an alteration of the charter, in order to get authority to do the thing contemplated. 3 English L. & Eq. R., 144. 7 Eng. L. & Eq. R., 505.

But when we come to cases where *strangers* have made contracts with a chartered company, and this in good faith, without knowing, or the means of knowing, of any excess of authority by the agents, serious difficulties may arise. In the English cases, the judges have held, that if the charter is a *public* one, persons are bound to know when the directors exceed their authority; and therefore, in such cases, there can be no recovery against the company, because the party is not deceived. And so, if the charter be a private one, and its provisions are *known* to the person contracting with its officers or agents, or if not known, and there be nothing more, the general rule would require the person, at

his peril, to acquaint himself with the objects and provisions of the charter. Beyond this we are not prepared to say how far the courts in that or this country will go.

> A new trial is to be granted.

In this opinion CHURCH, Ch. J., and STORRS, J., concurred.

WAITE and HINMAN, Js., did not think the evidence sufficient to authorize them to interfere with the verdict. On the contrary, they were inclined to think, that it was right. They did not, therefore, trouble themselves to examine critically the reasons which brought the other judges to a different result.

> New trial granted. *

---

* Pursuant to this decision, the cause was again tried, at the next term of the superior court, and again resulted in a verdict for the plaintiff, which the defendants also moved to have set aside.