## BURTIS *v.* THE BUFFALO AND STATE LINE RAILROAD COMPANY.

The statute (ch. 270 of 1847) making a company which owns a railroad connecting with one or more other roads, and receives freight to be transported to a place on the line of a road thus connected, liable as common carriers for the delivery thereof, applies as well where one of the connecting roads is wholly beyond this State as where all are within it.

The statute not only imposes the duty, upon the company undertaking it, of delivering the goods at the place of destination but enables it to make a special contract for their delivery in a limited time.

*Held,* accordingly, that a company whose road terminated at the boundary of this State, where it connected with a chain of roads running through Pennsylvania, Ohio, &c., was liable under its special contract for the delivery of goods, in three days, at a point in Illinois, upon such chain of roads.

*It seems* that such special contract is valid at common law independently of the statute. (*Per* DENIO, DAVIES, GOULD, and ALLEN, Js.)

APPEAL from the Supreme Court. Action for damages arising from the failure of the defendant, a corporation created by this State, to deliver a quantity of fruit trees at the time specified by a contract between the parties. The trial was before a referee, who found these facts: On the 24th October, 1855, the plaintiff, a nurseryman, at Rochester,

agreed with the general freight agent of the defendant for the transportation, from Buffalo to Chicago, of a large number of young fruit trees, which were designed, and the agent was so informed, for planting that fall. The agent agreed that they should be delivered at Chicago in three days. The trees were transported to Chicago, but some of them were delayed upon the route for seven and eight days, and their value was destroyed by their freezing. The line of the defendant's railroad terminated at the western boundary of the State, where it connected with a railroad running to Toledo, in Ohio, which there connected with a third railroad running to Chicago, in Illinois. The three roads were owned and operated by distinct and independent corporations, between whom no copartnership existed. The plaintiff had judgment, upon the referee's report, for $4,822, besides costs. The judgment. having been affirmed at general term 'in the eighth district, the defendant appealed to this court.

*Eben C. Sprague,* for the appellant.

*Harvey Humphrey,* for the respondent.

DENIO, J. The effect of the finding of the referee is, that Starke, the defendants' freight agent, had authority to make any contract for the transportation of property which the defendants could lawfully make by any instrumentality whatever. The language of the finding is, that said Starke was the defendants' acting freight agent, or master of transportation, and, as such, was authorized to receive property, to make contracts for such transportation, and to act as the general agent of such Company in that department of its business. We are to intend that this determination of the question touching his authority was warranted by the evidence; as we are not allowed to review the case upon questions of fact. There is nothing in the finding to qualify the comprehensive language to which we have referred; and, as has been said, it embraces the power to make any contract for transportation that the corporation had a right to make.

The making of a contract by which the defendants, by Starke as their agent, undertook to transport the trees from Buffalo to Chicago in three days, and the breach of that contract, is also established by the special finding of the referee.

The single question remaining to be examined is, whether the defendants' corporation had power to enter into such a contract. If we should deny the existence of that power, it might then become a question whether the defendants could excuse themselves from the consequences of the breach of a contract actually made in their name, by their duly authorized officers and agents, on the ground that it was without the scope of their corporate power. That would require a reëxamination of the points discussed, but not decided, in *Bissell* v. *The Michigan Southern, &c., Railroad Companies* (22 N. Y., 258); but, in the view which I take of the case, these questions will not arise, for, in my opinion, the defendants had express legislative authority to make the precise contract upon which the present action was brought.

By an act passed in 1847 it is provided that, wherever two or more railroads are connected together, any company owning either of said roads receiving freight to be transported to any place on the line of either of the said roads so connected shall be liable as common carriers for the delivery of such freight at such place. The act further declares that, in case any such company (that is, the company receiving the freight) shall be liable to pay any sum by reason of the neglect or misconduct of any other company or companies, the company paying such sum may collect the same of the companies by reason of whose neglect or misconduct it became so payable (ch. 270, § 9).

The defendants' counsel argue that the statute does not apply where the connection, as in the present instance, is between a railroad in another State and one of our own roads, because the indemnity which is conferred upon the company which shall pay damages, against the delinquent company, cannot be enforced against a company in another State, it not being within the scope of our legislation or amenable in our courts; and that, for the same reason, freight embarked on a

foreign railroad, to be carried over a road in this State running in connection with it, is not within the protection of the act. Hence it is insisted that such inter-State lines of railroads are not within the purview of the statute. This reasoning, though somewhat cogent, is not quite satisfactory to my mind. The act is eminently a remedial law, and should receive a liberal, as distinguished from a narrow, construction. It was, of course, known to the legislature that continuous lines of railroads, connecting this with conterminous States, had been and would continue to be constructed. The largest commercial town and the most active seaport of the Union being in this State, it was, of course, apparent that a very large amount of traffic between this and the neighboring States would pass over these inter-State lines. The motives which led to the enactment of the law applied quite as strongly to such lines of roads as to those which had their courses wholly in this State. A considerable proportion of all the merchandise sent by railroad from the city of New York passes into other States upon continuous lines of railroads, such as those referred to in this act.

I think it was not intended to impose the responsibility mentioned in the statute upon any of the railroads against the consent of the company owning them. The language is, that a railroad company, "receiving freight *to be transported*" to a place on the line of another road, shall be liable, &c. This, I think, is limited to cases of a company receiving property and agreeing, expressly or by implication, to carry it to a place on another connecting road. Should the company on whose road the property was first embarked, limit its undertaking to the line of its own road, the act would not apply, though it should be in the course of a transit to a place beyond its terminus, and should be directed to such place. The act, in my opinion, means, that if a railroad company will agree to carry property beyond the terminus of its own road, and receive the goods under such an agreement, it shall be liable as a common carrier for the delinquencies of the road running in connection with it on the route to the place of delivery. Any other construction would make the company receiving the property liable

Burtis *v.* The Buffalo and State Line Railroad Company.

for the fault of the connecting road, contrary to the contract between it and the owner of the property; which could not have been intended. Upon the construction suggested, the true sense of the act is, that the company, on whose road the property is first sent forward, may agree for its transportation to a point on another road which connects with it, and that, in such a case, the first-mentioned road shall be liable as a carrier for any breach of duty respecting the property, whether it happen on the other road or on its own; but, if it occur on the connecting road, the owners of that road shall be responsible to the one which has become liable to the owner for the amount paid on account of such liability. The company receiving the goods may not be satisfied with the indemnity thus proffered, on account of the pecuniary circumstances of the company made liable, or because such company is not bound by the act, or not within the jurisdiction of our courts, or for any other reason; but, in either case, it may refuse to receive the goods "*to be* transported" to a place beyond its own line, and limit its engagement to carrying them to the end of that line and delivering them to the road next in order towards the place of final destination. Where, as in this case, there is an express contract to carry to a place on the line of another road, the case is within the spirit as well as the language of the act; and if the indemnity by action against the other company is not satisfactory, it is the fault of the party accepting it instead of limiting its contract to the line of its own road. The legislature afforded all the indemnity which it was in its power to give; and it left the receiving company free to contract in such manner as to need an indemnity, or to refrain from so contracting. There is more difficulty in applying the act to a transit of property from another State into this; the company on which the goods are embarked not being subject to our laws in respect to a transaction out of our jurisdiction. It may be that the legislatures of the adjoining States have provided, or will provide, by similar legislation, for traffic originating in those States; but, however this may be, we can clearly establish the law for companies operating roads in this State. As

to these, the question is one of construction, and not as to power; and I cannot see any good reason for holding that domestic roads, running in connection with roads beyond the State, should not be considered within the statute. There is another view of the case, which seems to me satisfactory. The act assumes, by an irresistible implication, that railroad companies may make valid contracts for the delivery of property at places on other roads beyond the route of their own. This is, itself, an answer to the defence of *ultra vires*, which is the only answer which can be interposed to this action.

I am for affirming the judgment of the Supreme Court.

WRIGHT and SMITH, Js., concurred, putting their judgment upon the effect of the statute; DAVIES, GOULD, and ALLEN, Js., also concurred as well upon the construction of the statute as upon the validity of the contract independently of the statute.

SUTHERLAND, J. (dissenting.) It is plain to me if the defendants had the power to make or to authorize the making of the contracts, that Starke, acting as the general freight agent, should be deemed to have been authorized by the defendants to make them; that in the absence of any notice of a limitation of his authority, he should be deemed, as to the public or third parties, to have been clothed with all the power to make contracts for freight, or in respect to the carrying and delivery of freight, that the defendants had.

The defendants as a corporation could make contracts only through its agents or officers; and when a railway corporation permits an individual to act for it generally as its freight agent, why should he not, as to the public or third persons, in the absence of any notice to the contrary, be considered as having all the power to make freight contracts which the corporation can give him?

The question then is, whether the defendants had power to make the contracts? The contracts were to carry from Buffalo to Chicago, and deliver at the latter place a large quantity of

fruit trees within three days after the defendants received the trees at Buffalo. The defendants were incorporated under the general railroad act of 1850 (Laws of 1850, ch. 140), for the purpose of constructing, maintaining and operating a railroad from Buffalo westerly to the State line, a distance of about eighty-eight miles. So far as the objects or purpose of their incorporation relates to the question of power in this case, it may be said that they were incorporated for the purpose of carrying passengers and freight between Buffalo and the State line ; for by the act (§ 1) the incorporation authorized by it is "for the purpose of constructing, maintaining and operating a railroad for public use *in the conveyance of persons and property.*"

A corporation has only such powers as are expressly given by its charter, or by statute, or are necessary to carry into effect the powers expressly given. (*People* v. *Utica Insurance Company*, 15 John., 358 ; *Life and Fire Insurance Company* v. *Mechanics' Fire Insurance Company*, 7 Wend., 51 ; *New York Fire Insurance Company* v. *Ely*, 2 Cow., 699 ; 1 R. S., p. 600, § 3.) A corporation has all such powers as are necessary to carry out the objects of its incorporation, though subsidiary or incidental merely to the powers expressly given ; but its subsidiary or incidental powers are limited or restricted to the objects of its incorporation.

I assume, on the question of power in this case, that the defendants, in transacting their business of carrying persons and property on their railroad, had as much power to make contracts incidental to the transaction of that business, as an individual would have had.

The question then is, whether the defendants had power to make the contracts in question as incidental to their business of carrying freight and passengers on their railroad, between Buffalo and the State line ?

In my opinion, it is impossible to say that they had such power, for it cannot be said, that to carry and deliver freight, or to undertake to carry and deliver freight, or to be responsible for its carriage and delivery within a specified time, several

hundred miles beyond the western limit of their own road, was incidental to the business of carrying freight on their own road. If the defendants had power to make these contracts, as incidental to the business of carrying freight on their own road, I do not see why they have not power to lease and operate the railways connecting their road with Chicago, as incidental to the same business, indeed why they would not have had the power to construct these connecting roads, as incident to the construction of their own.

You may say, that it would be convenient for the defendants and for those dealing with them, that they should have the power to make contracts for the delivery of freight beyond their own road, at the *terminus of a connecting road, or at any* point on a connecting road; but I cannot see how the power to make a contract to deliver freight at Chicago, can be said to be incident to the power of carrying it from Buffalo to the State line. The contracting parties must be deemed to have understood, that the contract was in effect, that the defendants would carry the trees from Buffalo to the State line on their road, and make the proprietors of the connecting railways their agents to carry the trees from thence to Chicago, and would be responsible for the defaults of such agents.

Can it be said that the power to employ these agents, and to be responsible for their defaults, was incident or necessary to the carrying the trees, or to the undertaking to carry the trees on their own road? In my opinion you cannot say this without giving a new meaning to the words incident and necessary. The most that can be said is, that it might be convenient or profitable for the defendants to make such contracts; convenient for those dealing with them, and profitable to the defendants by increasing their business. It might be profitable for the defendants to buy fat cattle or wheat at Chicago and make arrangements for the carriage of the same on the connecting roads for the purpose of earning the freight of the cattle and wheat on their own road; but no one would suggest that the defendants would have the power to do this because they could make money by it. It will not do to say that the

profit of an adventure by a corporation makes it incident to the business authorized by its charter. Were it so, a railroad corporation would have power to make a contract to furnish clothes to the army.

In addition to the numerous cases establishing the general principle that the incidental powers of corporations are limited or restricted to the objects of their incorporation, the cases of *Hood* v. *New York and New Haven Railroad Company* (22 Conn., 16, 502); *Pennsylvania, Delaware and Maryland Steam Navigation Company* v. *Dandridge* (8 Gill & John., 248, 329), may be cited to show that the defendants had no power to make the contracts in question.

In the case in 22 Conn., the question of power arose on an alleged contract to carry a passenger beyond the railway company's road; but the question of power to contract must be the same, whether the subject of the contract be the carriage of a passenger or of goods.

As the actions in *Elmore* v. *Naugatuck Railroad Company* (22 Conn., 457, 458); *The Naugatuck Railroad Company* v. *The Waterbury Button Company* (24 id., 468); and *Nutting* v. *The Connecticut River Railroad Company* (1 Gray, 502), appear to have been brought against the defendants as common carriers for an alleged default of duty as such, in not delivering the goods at the place beyond the company's railway for which they were marked, perhaps the question of power to contract for the delivery at such place was not directly involved; but it is plain that these cases were decided on the ground that the business of the defendants was, by their charter, restricted to their own railway. It appears to me that the same considerations which led the court in these cases to hold that there was no duty on the part of the defendants, under the circumstances of the case, to deliver the goods at the place to which they were addressed, beyond the terminus of their own road, must lead to the conclusion that the defendants had not power to contract to deliver the goods at such place.

On the other hand, there are numerous American and English cases holding that carriers by railroad receiving freight

to be delivered beyond their own road, at a place on a connecting road, or at the terminus of one or more connecting roads, are responsible for its safe carriage to and delivery at such place, and liable for a loss which may occur beyond their own road. (*Weed* v. *Saratoga and Schenectady R. R. Co.*, 19 Wend., 534; *Hart* v. *The Rensselaer and Saratoga R. R. Co.*, 4 Seld., 37; *Foy* v. *The Troy and Boston R. R. Co.*, 24 Barb., 382; *Schoeder* v. *The Hudson River R. R. Co.*, 5 Duer, 55; *Cary* v. *The Cleveland and Toledo R. R. Co.*, 29 Barb., 36; *Muschamp* v. *Lancaster and Preston Junction Railway Co.*, 8 M. & W., 421; *Watson* v. *The Ambergate, Nottingham and Boston Railway Co.*, 3 Eng. L. & Eq., 497.)

The English cases appear to hold that, from the mere receipt of the goods marked for a place beyond the limits of the road of the railway carrier, in the absence of any special agreement, the undertaking or duty to deliver at such place is to be presumed.

The American cases appear to hold, that such an undertaking or duty would not be presumed from the mere receipt of the goods so marked or addressed. (*Van Santvoord* v. *St. John*, 6 Hill, 157; and the cases in 22, 23 and 24 Conn., and 1 Gray, before referred to.)

But it would appear to be settled, by both the American and English cases, that when, from usage in the particular business, or by receiving pay for the carriage of the goods to the place to which they are addressed beyond the railway company's road, or from any other circumstance, it is to be presumed that the undertaking of the railway company was to deliver at such place, that they are responsible for the delivery of the goods at such place, and liable if the goods are lost after leaving their own road.

Now, I am of the opinion that these cases cannot be upheld upon the ground of the power of the railway corporation to contract for such delivery beyond its own road, and thus, by contract, to become responsible for the defaults of other railway corporations; but that they may be upheld, independent of contract, upon the principle that a railway corporation, like

any other common carrier, when it actually undertakes the trust of carrying the goods of another, and delivering them at a particular place, is responsible for their safe carriage to and delivery at such place. In other words, it appears to me that these cases should be considered as holding merely that corporations, as common carriers, are liable for a default or neglect of duty like other common carriers; that the fact of being a corporation does not absolve a railway corporation from the duty of the due execution of a trust actually undertaken by it as a common carrier, though the complete execution of the trust may involve action or responsibility on its part beyond the objects or purpose of its incorporation.

That one who actually undertakes a trust as bailee, is liable independent of contract, for want of due care in executing the trust, was held in the leading and familiar case of *Coggs* v. *Bernard*, (Lord RAYMOND, 909; *S. C.*, Holt R., 13. See also *Bissell* v. *Michigan, &c., R. R. Cos.*, 22 N. Y., 254.)

A railway corporation may be liable for want of due care in executing a trust actually undertaken, which it has not power to contract to undertake. Suppose a railway company prohibited by their charter from running either freight or passenger cars on Sunday, should nevertheless run their cars on Sunday and undertake to carry A. B. or his goods on Sunday. Would not the company be liable for an injury to either, caused by the negligence of their employees, whilst thus running their cars in violation of their charter? It is plain to me that they would. The parties could not be said to be in *pari delicto;* nor could the company set up its own violation of its charter, as excuse for the negligence, and yet it is plain, that the company would have had no power to contract to carry either A. B. or his goods on Sunday.

Independent of contract, at common law, or by the custom of the realm, the duty and liability of a common carrier commenced with the receipt of the goods, and ended only with their delivery according to the undertaking or trust assumed. (*Hyde* v. *The Trent and Navigation Company*, 5 T. R., 389;

*De Mott* v. *Laraway*, 14 Wend., 225; *Gibson* v. *Culver*, 17 Wend., 305.)

The use of the word undertaking in the books, in expressing the nature and intent of the trust assumed by common carriers, ought not to be understood as implying that their liability is necessarily founded on contract: a common carrier is liable independent of contract. (*Campbell* v. *Perkins*, 4 Seld., 430; *Bank of Orange* v. *Brown*, 3 Wend., 158; 1 Smith's Lead. Cases, 5th American Ed., 325, 326, note.) The case of *The Bank of Orange* v. *Brown*, is valuable, as containing a review of the English cases by SAVAGE, Ch. J.

At common law the action against a common carrier for the loss of goods might be either assumpsit or case; but in either action negligence was alleged. (*Bank of Orange* v. *Brown*, 3 Wend., 158, before cited; 2 Chit. Pl., 355, 651.)

The care and diligence required of common carriers and innkeepers by the common law are so extraordinary that proof of the non-delivery or loss of the goods is proof of negligence; so that, in effect, their liability is that of an insurer of the safe carriage or keeping of the goods entrusted to their care; although it is really founded on negligence—on a default of the care and diligence required of common carriers and innkeepers by the law as a duty; and injury resulting from the neglect of a legal duty is a tort.

Under the Code it is probable that in a complaint against a common carrier for the loss of goods, it would not be necessary to allege, either a formal assumpsit or negligence: that it would be sufficient to allege the receipt of the goods by the carrier to be carried and delivered at a certain place, and their non-delivery at such place within a reasonable time. Take such a complaint, and what is the ground of the liability claimed? Is it not default of duty, of a duty assigned by law independent of contract?

In the cases before referred to, and which the counsel for the plaintiff insists show that the defendants had power to make the contracts in question, the goods were delivered upon the usual assumed trust or implied undertaking of a common

carrier to carry and deliver, with reasonable diligence, not under a special contract to carry and deliver within a specified time. In such a case I have endeavored to show the company might be held liable for the loss or non-delivery of the goods beyond their own route independent of, contract. But in this case the action is upon special contracts to carry and deliver within three days, and the damages claimed and recovered were not for the loss or non-delivery of the trees, but for the failure to deliver within the time, according to the contract.

It is plain, then, that in this case the power of the defendants to make the contracts set out in the complaint is necessarily involved; and that if they had not power to make them the plaintiff cannot recover unless the defendants are estopped from setting up their want of power.

On the question of power the considerations above adverted to lead me to the conclusion that the defendants had not power to make the contracts set out in the complaint, and that they were, therefore, void. If void, I think it may be said that they were illegal, for it appears to me, proper to say, that the contract of a corporation (an artificial being deriving its existence and all its powers from law), which it has not power to make, is illegal.

On the question of power, the circumstance that the execution of the contracts involved the carriage of the goods on railways out of this State and in other States, I regard of no consequence. The defendants have power to do, or to contract to do, in another State with its assent, whatever they have power to do or contract to do in this. I think the question of power in this case is precisely the same as if the defendant had received the trees under a contract to deliver them at New York city or Ogdensburgh within a certain time.

In my opinion the act of 1847 (ch. 270, § 9), providing that when two or more railroads are connected, either company receiving freight to be transported to any place on the line of the other shall be liable as a common carrier for the delivery of such freight, does not affect the question of power in this case. The cases before adverted to would appear to establish

the liability of the railway carrier in the case provided for by the statute, independent of the statute. The liability under the statute is certainly independent of contract, and for reasons before stated, I think the cases may be considered as establishing the liability independent of contract. But in this case the freight was received under special contracts to be delivered in three days; and the cause of action is the failure to deliver within the time, not the loss of the goods; the goods were delivered but not until some days after the contract time.

I see no room for the doctrine of estoppel in this case. It will not do to say that the mere fact of making a contract which a corporation has not power to make estops it from setting up the want of power. To apply the doctrine of estoppel on that ground alone would, in effect, abrogate the principle of the limitation of the powers of corporations resulting from their nature and creation and firmly established by law. If the contracts in this case had been within the scope of the general powers of the defendants, though void as to them for want of authority of the agent, or as made in violation of some by-law or regulation of the company, they might perhaps have been estopped from saying that they were void on either ground.

Having come to the conclusion that the contracts are void, and that the defendants are not estopped from availing themselves of their want of power, it is unnecessary to examine the question as to the rule of damages adopted by the referee.

My conclusion is, that the judgment of the Supreme Court should be reversed, with costs.

Judgment affirmed.