## George McMillan et al. v. Mich. S. & N. I. R. R. Co.
## John Heffron et al. v. Same.
## Robert W. King, v. Same.

*Common Carriers: Liability as Lessees: General R. R. Law.* Where the power to take a lease of a railroad, built under the general railroad law, is derived solely from this law, the rights and liabilities under the lease are governed by it, and not by the charter of the company which becomes lessee.

*Common Carrier: When liability ends.* Whether a common carrier who has transported property over his line and stored it in his warehouse awaiting delivery to the consignee, who has not yet been notified of its reception, continues to be liable as a carrier; *Quære*—The Court being equally divided: Cooley and Christiancy JJ. holding the affirmative and Campbell J. and Martin Ch. J. holding the negative of the proposition.

McMILLAN ET AL. *v.* M. S. & N. I. R. R. Co.

*Common Carriers: Limitation of Liability under General Railroad Law.* Under the provision in the General Railroad Law (Session Laws 1855, p. 173) companies formed under it are forbidden from restricting their common law liability as carriers. *Held,* that under this provision persons for whom goods are carried are not prevented from releasing the carrier by express contract, from any portion of that liability.

*Common Carriers: When bound to carry: Notices.* Carriers cannot limit their liability by a mere notice published, or posted, or otherwise brought to the knowledge of the consignor; nor can they refuse to receive property for transportation unless the consignor will agree to enter into a special contract therefor.

Neither will the sending of goods under a special contract in any number of instances bind the party sending them to similar terms in the future, without agreement.

*Common Carriers: Ownership of goods: Consignees.* Consignees accepting a consignment are bound by the terms made by their consignors, and in such case the carrier has a right to assume the consignor to have had full authority to act in the premises.

*Bill of Lading: Contract.* A bill of lading fixes the rights and liabilities of the parties when its terms have been agreed upon; and its acceptance by the consignor, without objection, is an implied assent to its terms.

When a consignor has received a bill of lading which contains limitations upon the carrier's liability without making any objection thereto, and has not in any way been imposed upon or misled, he cannot defeat these limitations by showing that he received the bill of lading without reading it, or being aware that it contained them.

*Bill of Lading: Restrictions: Consideration.* When a bill of lading contains restrictions upon the Carrier's Common Law liability, the court will not presume in the absence of testimony that it was not done upon proper and sufficient consideration.

*Bill of Lading, construction of: Subsequent Carrier.* When a bill of lading was issued at Cincinnati conditioned to deliver certain goods "at Toledo for Detroit": *Held,* that the contract was to carry to Toledo and forward from there to Detroit; and that when the defendants received said goods at Toledo they received them, in the absence of any clauses modifying the liabilities beyond that point, under their common law liability, irrespective of the terms of the bills of lading applicable during the former transit, except that they would not be authorized to collect of plaintiffs any larger freight than the sum specified.

*Heard May 23d and 24th. Decided October 15th.*

Cases brought up for review from Wayne Circuit.

These were three actions on the case brought against defendants as common carriers, to recover the value of certain goods burned while in their depot at Detroit, in April, 1866.

The defendants pleaded the general issue. The cases were heard together without a jury, on stipulations.

McMILLAN ET AL. *v*. M. S. & N. I. R. R. Co.

The following is the one signed in the *McMillan* case: "On the trial of this cause the following facts shall be re-ceived and taken as admitted, subject, however, to all objections as to relevancy and competency.

*By defendant on behalf of plaintiffs :*

1. That the defendant is, and in the month of April, 1866, was a corporation created by the laws of the State of Michigan, and a common carrier of goods from Toledo in the state of Ohio, to Detroit in the State of Michigan. That it was then, and now is, lessee in perpetuity, of the road of the Detroit, Monroe and Toledo Railroad Company, extending from the south line of the State of Michigan to said Detroit, and that said company last named is organized under the general railroad law of the State of Michigan, and that defendant manages said road by the same officers and agents as it does the road built under its own charter.

2. That, on the 19th day of April, 1866, the plaintiff purchased of Samuel Lewenthal, at Cincinnati, Ohio, three cases of tobacco, paying therefor $361.07. That on the 20th day of the same month, the plaintiffs purchased of W. Weake & Co., at Cincinnati, Ohio, fifteen cases of wine, and twenty kegs of wine, paying therefor $621; and that on the 23d day of the same month the plaintiffs purchased of Proctor & Gamble, at Cincinnati aforesaid, ten boxes of candles, paying therefor $96.48. Subsequently, the said goods so purchased, were delivered by the above named vendors to the Cincinnati, Hamilton and Dayton Railroad Company, duly marked and consigned to the plaintiffs, and the said company gave therefor the bills of lading hereto annexed.

3. That on the 25th day of April aforesaid, said plaintiffs delivered to the defendant, at Adrian, in the State of Michigan, two barrels of eggs, marked and consigned to the plaintiffs at Detroit, for which the defendant gave the plaintiffs a receipt, a copy of which is hereto annexed. The value of the said eggs was $26.

4. That defendant received said three first purchases of goods at Toledo aforesaid, from the Dayton and Michigan Railroad Company (which company is one of those forming a transportation route from Cincinnati to the city of Detroit), and carried them, together with said two barrels of eggs, over said Detroit, Monroe and Toledo Railroad to Detroit, where, on the night of the 26th of April last, they were all consumed by a fire which destroyed defendant's depot and its contents.

*By plaintiffs on behalf of defendant:*

1. That all the bills of lading in use by the defendant, and all the contracts of affreightment, the instructions to agents, and the printed rules posted in all its depots and station houses, for the past ten years, have contained clauses exempting the defendant from liability for losses by fire, and providing that where goods are in its depot awaiting delivery to consignees, it will be liable only as warehousemen and not as carrier; and that plaintiff has been accustomed to do business with defendant, and to receive and send goods over its road under said bills of lading.

2. That said tobacco was received at defendant's depot in Detroit, and, in conformity with the usage of business, unloaded from the cars and placed in its warehouse on the 24th day of April last. That said two barrels of eggs were so received, unloaded, and placed in defendant's warehouse on the 25th day of April, and that said wine and candles were so received, unloaded and placed in defendant's warehouse on the 26th day of April last, at which depot all consignees receive their goods. That the depot of defendant closed generally at 6 o'clock, P. M., though in cases of special demand goods are sometimes delivered after that hour.

That freight trains from Toledo arrive at Detroit usually from 2 to 3 o'clock, P. M.

That, on the arrival of the Freight train, way bills are handed to the tally clerk, who makes from them a list of

goods for his tally book. He then checks the goods from the cars as they are unloaded, in the course of that afternoon or evening. It is a usage of the company to give notice on the following day, between the hours of 10, A. M., and 4, P. M., to the consignee of the arrival of the goods so unloaded.

*By defendant on behalf of plaintiffs—rebutting.*

1. That the consignees did not know of the exemptions and conditions contained in the bill of lading hereto annexed, though they had been accustomed to ship goods over the same route under similar bills.

2. That the plaintiffs did not know of the exemptions and conditions aforesaid, contained in the bills of lading, posted notices, and contracts of affreightment of the defendant.

3. That the plaintiffs received notices, which are hereto annexed, of the arrival of said tobacco and eggs about half past three o'clock, P. M., of said 26th day of April; but did not receive any notice of the arrival of said wine or candles.

That it had long been the usage of the defendant to notify plaintiffs of the arrival of goods.

That the depot of defendant at Detroit, and that of the Detroit & Milwaukee Railroad Company, were under one and the same roof, but separated by brick walls, so that the apartment of each was distinct from the other. Goods arriving by either road, and destined for shipment on the other, were usually delivered by the road bringing them at a place between the two apartments, known to the freight employees of the two companies as "neutral ground," where the other company received them.

On the said 26th day of April, the defendant transported over its road, and deposited in its apartment of said depot, a quantity of oil, marked as follows: a part of it "Petroleum," a part "Benzine," and a part "Benzole," which was on the same day delivered by the defendant on said neutral

ground, for transportation by the said Detroit & Milwaukee Railroad Company over its road.

In the evening of the same day, the Detroit and Milwaukee Railroad Company, by their employees, carried said oil from the place where it was delivered as aforesaid, by trucks or otherwise, into its own apartment for shipment over its road, completing the removal there between 9 and 10 o'clock, P. M. Some of the barrels were leaking, and two of them were coopered by the Detroit and Milwaukee Railroad Company's employees, after being removed into their apartment. Immediately after said oil was removed to the apartment of the Detroit and Milwaukee Railroad Company, one of its employees set a glass lantern which he carried upon the floor of the depot, not far distant from where said barrels were standing, and the fire which consumed said property as aforesaid, together with all the apartments of both of said companies' depots, caught from the contact of the gas arising from said oil with the said lantern.

The length of the Detroit and Milwaukee depot was about 600 feet, and the distance from the point where said petroleum was deposited by defendant, to the point where it was subsequently placed by the Detroit and Milwaukee Railroad Company, and where the fire originated, was about 500 feet, and which latter point was the extreme end of said Detroit and Milwaukee Depot from that of defendant."

The following is a copy of the form of the three bills of lading given for the foregoing goods, except that the bill covering the *tobacco*, excepted *"fire in the depot, and unavoidable accidents of the railroad"* :

[DUPLICATE.]

## "CINCINNATI, HAMILTON AND DAYTON RAILROAD.

Received, in good order and condition, of Proctor & Gamble, at the Depot of the Cincinnati, Hamilton and Dayton Railroad, articles marked as below, which are to be delivered, in like good

order, at Toledo, for Detroit, unto G. &. R. McMillan, or assigns, he or they paying freight for the same at the rate of thirty (30) per 100.

CINCINNATI, April 23, 1866."

The following is a copy of the form of the notice given by the defendant to G. and R. McMillan, of the arrival of the *tobacco* and *eggs*, and referred to in the foregoing stipulation:

## "MICHIGAN SOUTHERN AND NORTHERN INDIANA RAIL- ROAD.

M. S. and N. I. R. R. FREIGHT OFFICE, }
DETROIT, April 25, 1866.          }

G. & R. McMillan:    The following articles, consigned to your address, are now ready for delivery at this depot:

Freight and charges payable on delivery.    Property to be removed within twenty-four hours, otherwise storage will be charged. No freight delivered except to consignee or his written order.    No claims for damages will be allowed unless made before removal of goods.    All contracts to be presented when goods are called for.

A. H. EARL, *Agent.*

Agent M. S. and N. I. R. R. Co.— Please deliver the above named articles to _____

_____ ."

In the case of *Heffron v. the Michigan Southern and Northern Indiana Railroad Company,* the goods claimed to have been destroyed consisted of one hundred cases of oysters.    The stipulations were the same as in the McMillan case, except with reference to the time of giving notice — it appearing that in this case notice of the arrival of the oysters was given in the forenoon of the 26th day of April. The form of the original bill of lading in this case is as follows:

McMILLAN ET AL. *v.* M. S. & N. I. R. R. Co.

(COPY.)

## "BALTIMORE AND OHIO RAILROAD.

BALTIMORE, April 13, 1866.

Received of Ruth & Fleming the following packages, marked and numbered as described below, in apparent good order (contents and value unknown), to be transported by the Baltimore and Ohio Railroad to Benwood, to be forwarded thence by rail to Heffron & Parker, at Detroit, Michigan.

*And Whereas,* In their transit from Baltimore to their said place of ultimate destination, the packages aforesaid must pass through the custody of several carriers, it is understood as a part of the consideration on which such packages are received, that the exceptions from liability made by such carriers respectively in their several rules and regulations adopted for their own government, and for the receipt, transportation and delivery of freight, shall operate in the carriage by them respectively of said packages as though herein inserted at length; and especially that neither of said carriers, nor either nor any of them, shall be liable for leakage of any kinds of liquids, nor for losses by the bursting of casks or barrels of liquids, arising from expansion and other unavoidable causes; breakage of any kind of glass, carboys of acid, or articles packed in glass, stoves or stove furniture, castings, machinery, carriages, furniture, musical instruments of any kind, packages of eggs, or for loss or damage on hay, hemp, cotton, or for loss or leakage of rice, or the evaporation or leakage of sugars or molasses, or leakage of oil of any description, or any article the bulk of which renders it necessary to be shipped in open cars; or for damage to perishable property of any kind, occasioned by delays from any cause, or change of weather, *or for damage or loss by fire,* or for loss or damage on the lakes and rivers. And it is further especially understood, that for all loss and damage occurring in the transit of said packages, the legal remedy shall be against the particular carrier only in whose custody the said package may actually be at the time of the happening thereof—it being understood that the said Baltimore and Ohio Railroad Company, in receiving the said packages to forward as aforesaid, assumes no other responsibility, for their safety or safe carriage, than may be incurred on its own road and on the road of the North Western Virginia Railroad Company. All goods carried by this company are charged at

actual gross weight, excepting such articles as are provided for in our general tariff.

All property will be subject to necessary cooperage, and freight to be paid upon the actual gross weight, ascertained by the companies' scales. Claims for damages must be reported by consignees to the delivering line within thirty-six hours after the arrival of the freight at the place of delivery indicated above. In the event of the loss of property under the provisions of this agreement, the value or cost at the point of shipment shall govern the settlement of the same.

*It is understood*, and is a part of this agreement, that whenever the Ohio River navigation is suspended by low water or ice, the freight so contracted through by rail and river shall be forwarded from Wheeling or Parkersburg by railroad, at through railroad rates and actual cost of transfer.

The following through rates guaranteed by rail to Detroit, Michigan: * * *

In the case of *R. W. King v. The Michigan Southern and Northern Indiana Railroad Company*, the goods claimed to have been destroyed were eight packages of glassware shipped from Boston, and two other bills of glass shipped at Pittsburgh.

The stipulations were the same as in the *McMillan* case, except as to the time of notice of arrival (and which was given about $4\frac{1}{2}$ o'clock, P. M. on the 26th of April), and the form of the bills of lading, of which latter there were three, as follows:

McMillan et al. *v.* M. S. & N. I. R. R. Co.

[DUPLICATE.]

## " CLEVELAND AND PITTSBURGH RAILROAD COMPANY.

<table>
<tr><td>U. S. Rev.<br>Stamp.<br>Five Cents.</td></tr>
</table>

PITTSBURGH, April 14th, 1866.

Received from Lippencott, Fry & Co., in apparent good order, contents unknown, the following articles, marked as per margin, which the Cleveland and Pittsburgh Railroad Company promises to carry by Railroad from Pittsburgh, and deliver in like order, the dangers incident to railroad transportation, *fire, and all other unavoidable accidents excepted,* unto railroad agent, or assigns, at the company's freight depot at Cleveland, on payment of freight at the rate of —— cents per one hundred pounds and charges $——.

The said Cleveland and Pittsburgh Railroad Company further stipulates that when the articles marked below are to be forwarded beyond any station on this road, and are consigned to the company's agent at that point for that purpose, said company agrees to forward as herein directed, and guarantees that the costs of transportation of said goods from Penn street depot to Detroit, by rail from Cleveland, shall not exceed —— cents per one hundred pounds. It is distinctly understood and agreed that said company hereby incurs no responsibility in relation to said goods, after their arrival at the point from which they leave this road, except as above mentioned.

*It is agreed,* and is a part of this contract, that the company will not be responsible for the leakage of liquids (oils of every description, etc.), breakage of glassware, injury or breakage of looking-glasses, stove castings, nor for injury to the hidden contents of packages, nor for the decay of perishable articles, or for damage to sheet or hoop iron.  Coal and carbon oils in less quantities than car loads, " company's convenience as to time."

McMILLAN ET AL. *v.* M. S. & N. I. R. R. Co.

[TRIPLICATE.]

## LAKE SHORE AND MICHIGAN SOUTHERN EXPRESS FREIGHT LINE.

**CONTENTS OF PACKAGES UNKNOWN.**

☞ No liability assumed for miscarriage or wrong delivery of goods that are marked with initials, numbers, or imperfectly marked.

*Weights and Classification subject to correction.*

R. W. KING,

Detroit,

Mich.

**L. S. & M. S. LINE.**

All articles entered on this Bill of Lading shall be subject to and governed by the classification as published by railroads, and to the rates properly belonging to such classification : and the rates as written in below shall apply only to such goods as are included in the class opposite or against which the rate is so written in.

Articles enumerated in classification, as subject to once and a half or twice first class rates, shall be subject to once and a half or twice, as the case may be, the first class rate written herein.

RATES.

Special,          ....cts. per 100 lbs.
Double 1st Class....cts. per 100 lbs.
1st Class,     1.34 cts. per 100 lbs.
2d Class,       ....cts. per 100 lbs.
3d Class,       ....cts. per 100 lbs.
4th Class,      ....cts. per 100 lbs.

. As per classification on back, subject to change west of Chicago.

16 MICH. — F.

BOSTON, April 12, 1866.

Received from Cape Cod Glass Company, the following packages ( contents and value unknown ), in apparent good order :

(8) Eight Pkgs. Glassware.

☞ It is understood that this line assumes no liability for loss or damage to the above goods, on the Mississippi, Missouri or Ohio rivers, nor for delays occasioned by low water or ice in the rivers; and the said goods may be stored at the risk and expense of the owners; nor for loss, damage, or delay, by reason of mobs, riots, rebellion, or guerillas in the state of Missouri, or any state where rebellion exists.

Supposed to be marked and numbered as per margin, contents and value unknown, to be forwarded to the place named in the bill of lading, upon the following conditions, to wit : That the owner or shipper hereby assumes the risk of loss or damage by lake or river navigation, *fire, leakage of all kinds of liquids*, rice in casks, breakage of all kinds of marble, glass and glassware, or articles packed in glass, stoves and stove furniture, castings, machinery, carriages, furniture, musical instruments of all kinds, damage or loss of any article the bulk of which renders it necessary to be shipped in open cars, and damage from unavoidable or accidental delays, damage to all articles occasioned by weather or natural tendency to decay. All property shipped on this bill of lading will be subject to necessary cooperage, and will be delivered at the depots of the company or steamboat landing. It is also expressly agreed between the parties, that the line shall not be held accountable for any damage or deficiency in packages of goods if delivered at Detroit depot in good order, and that no liability will be assumed for wrong delivery of goods marked by initials, or for wrong carriage of goods that are imperfectly or wrongly marked. And in cases of loss or damage of any of the goods named in this bill of lading, for which the line may be liable, it is agreed and understood that they shall have the benefit of any insurance effected by or for account of the owner of said goods.

NOTE—*Powder, friction matches, or articles of a combustible nature*, will not be taken on any terms; and if found secreted in packages will be confiscated, and the owners or shippers will be held responsible for any damage arising therefrom, and these conditions are made a part of the undertaking of this bill of lading.

..........................................*Agent.*

McMillan et al. *v.* M. S. & N. I. R. R. Co.

This bill of lading is issued upon the receipt of Boston and Worcester Railroad.

This contract subject to change of classification west of Chicago and Milwaukee.

Railroad receipts should in all cases be exchanged for bills of lading, as the line will only be responsible for property for which a bill of lading has been given.

Amongst other conditions and rules, attached thereto, were the following:

This company will not hold itself liable at all for any injury to any articles of freight, during the course of transportation, occasioned by the weather or accidental delays, or natural tendency to decay. Nor will its guarantee of special dispatch cover cases of unavoidable or extraordinary casualty and storms, or delays occasioned by low water or ice; and may be stored at the risk and expense of the owner. Nor will they hold themselves liable, as common carriers, for such articles, after their arrival at their place of destination, at the company's warehouses or depots.

All articles of freight arriving at their places of destination, must be taken away within twenty-four hours after being unladen from the cars — the company reserving the right of charging storage on the same, or placing the same in store at the risk and expense of the owner, if they see fit, after the lapse of that time.

CLEVELAND AND PITTSBURGH RAILROAD COMPANY.

BRIDGEPORT, April 18, 1866.

Received from Osterling, Henderson & Co., by the Cleveland and Pittsburgh Railroad Company, the following property, in apparent good order (except as noted), marked and consigned as in the margin, which they agree to deliver with as reasonable dispatch as their general business will permit, subject to the conditions mentioned below, in like good order (the dangers incident to railroad transportation, *loss or damage by fire* while at depots or stations, loss or damage of combustible articles by fire while in transit, and unavoidable accidents excepted), unto Wm. H. Stewart, Agent, or assigns, at the company's freight depot at Cleveland, Ohio, on payment of freight at the rate of —— cents per 100 lbs., and charges $——.

The said Cleveland and Pittsburgh Railroad Company further stipulate, that when the articles marked below are to be forwarded beyond any station on this road, and are consigned to the company's agent at that point for that purpose, said company agree to forward as herein directed, and guarantee that the cost of transportation of said goods from Bridgeport, Ohio, to Detroit, Michigan, by rail and lake from Cleveland, Ohio, shall not exceed 45 cents per 100 lbs.　It is distinctly understood and agreed that said company hereby incur no responsibility in relation to said goods after the same shall have been receipted in apparent good order at the point at which they leave this road, except as above mentioned.

Amongst other conditions attached thereto, were the following :

The company does not agree to carry the property by any particular train, nor in time for any particular market.

It is part of this agreement that all other carriers transporting the property herein receipted for, as a part of the through line, shall be entitled to the benefit of all the exceptions and conditions above mentioned, and if a carrier by water, he is entitled to the further benefit of exception from loss or damage arising from collision and all other dangers incident to lake and river navigation.

The undersigned hereby consent and agree to the conditions and stipulations named in this bill of lading, as part of the contract between the Cleveland and Pittsburgh Railroad Company and ourselves.

| U. S. Revenue Stamp. Five Cents. |
| --- |

OSTERLING, HENDERSON & CO.,

*Shippers.*

The foregoing three cases were heard together by the court, without a jury, and judgment was rendered in favor of defendants.

*Maynard & Meddaugh* and *C. I. Walker* and *D. C. Holbrook,* for plaintiffs.

1. In the absence of a special contract, the defendant was liable, as insurer of the property in question, from the

moment it came into its possession until delivered at Detroit, notice to the plaintiffs of its arrival, and the expiration of a reasonable time thereafter for its removal.—2 *Mich.* 538; 18 *Wis.* 345; 32 *N. H.* 523; 14 *Ga.* 277; 17 *Wend.* 305; 2 *Kent's Com.* (*9th*), p. 816, note *C.*; *Angell on Carriers, p.* 286, et seq.; 2 *Pars. on Cont. p.* 183, et seq.; 34 *N. Y.* 497.

There are, however, a number of American cases, that, either by express adjudication or clearly asserted dictum, hold the broad doctrine that the carrier having completed the transportation of the property and deposited it in his warehouse ready for delivery, *eo instante* ceases to be liable as carrier.—1 *Rawle,* 203; 4 *Pick.* 371; 10 *Met.* 472; 23 *Vt.* 186; 1 *Gray,* 263; 20 *Ill.* 402, 404, 407; 5 *Dutch.* 393; 30 *Penn.* 247; 6 *Jones, N. C.* 343.

2. But irrespective of the general question of the carrier's duty in the delivery of property, we insist that, *under the facts of these cases,* there can be no doubt that it was defendant's duty to notify plaintiffs of the arrival of their property, and its liability as common carrier continued not only until this was done, but until a reasonable time thereafter for removal of the property.

The record says: "It had long been the usage of defendant to notify plaintiffs of the arrival of their property." By this usage it is estopped from denying the obligation to give the notice in these cases.—*Redfield on Railways,* 251; 20 *Conn.* 354.

*a.* Assuming defendant's obligation as the result of its practice, to have been to notify plaintiffs of the arrival of property, it seems to us necessarily to follow that the liability of common carrier continued until the notice was given, and a reasonable time thereafter had elapsed for removal of the property.

The contract between the carrier and the shipper, as usually embodied in the bill of lading, and always as created by law, is simply for the carriage and delivery of the property; nothing else being contemplated. The carrier is dealt with and treated only as carrier.

The law will not change this relation, substituting for the carrier's contract and liability, the contract and liabilities of a warehouseman, without the consent, either express or implied, of the owner or consignee.

This consent is not to be implied from mere lapse of time, unless the consignee is aware that his property is ready for delivery.

*b.* The practice of defendant, though persisted in for the past ten years, as the record shows, of inserting in its bills of lading contracts of affreightment, notices posted in its depots, and instructions to its agents, and clauses exempting it from losses by fire, and providing that when goods are in its depots awaiting delivery it will not be liable except as warehousemen, cannot have the effect of an usage, nor avail it in any manner as a defense in these cases.

It is now well settled by the authorities, that usage may render that, a good delivery of property by the carrier, which, but for the usage, would be held insufficient to discharge him. The law imposes upon the carrier the duty of delivery; but leaves the manner of it to be regulated by usage or custom.—*Edwards on Bailm.* 531.

The cases treat usage as entering into and forming part of the contract, so far as permitted to modify a rule of law, and it can only be sustained on this theory.—23 *Vt.* 186; 15 *Johns.* § 39; 17 *Wend.* 305.

But by the terms of these notices, the liability of defendant is not to be changed from that of carrier to warehouseman until the property is "in its depot awaiting delivery," and we submit that in these cases the property was not "awaiting delivery" until notice to the plaintiffs.

*c.* While the power of the common carrier, to regulate his business, in very many particulars—only limited by the condition that his regulations must be reasonable—is unquestionable, we insist that he can only limit his common law liabilities by contract.—19 *Wend.* 251; 6 *Allen,* 486.

See also the following cases—2 *Ohio St.* 131; 1 *Kern.* 485; 24 *Ill.* 466; 24 *N. H.* 71; 23 *Vt.* 186; 19 *Wend.* 234; 21 *Id.* 354; 2 *Comst.* 204; 2 *Hill*, 623; 2 *Kelly* (*Geo.*), 249.

If, then, defendant was bound, either by its own usage or by general rule of law, to notify plaintiffs of the arrival of their property, the provision in its bills of lading, etc., "that it will not be liable for losses by fire," considered simply as an usage, or an attempt to limit its common law liabilities, is of no effect.

3. There is no contract in either of the cases relieving defendant of his common law obligations.

*a.* The defendant did not issue bills of lading for any of the property in question, nor enter into a special contract for the carriage of it, so far as the cases show, but received it all from other carriers.

*b.* The bills of lading, so far as they purport only to undertake the carriage of the property to Toledo, and thence to forward, are exhausted and satisfied when this is done, and their terms and conditions do not run with the property to its destination — 1 *Hurls. and Nor.* 516.

*c.* There is no consideration shown for a release of defendant from its common law liabilities, and consequently none of these bills can have the effect of a contract for that purpose. — 7 *Exch.* 707; 25 *N. Y.* 442; 26 *Vt.* 247.

*d.* It is admitted as a fact, in regard to all these bills of lading, that the consignors to whom they were issued did not know that they contained exemption clauses. The facts essential to a contract are therefore wanting — 34 *Vt.* 565.

The fact of the consignors' ignorance of these special clauses, cannot be excluded as subject to the rule against the admission of oral testimony to contradict or vary a written instrument.

The inquiry is, whether these bills of lading are the contracts of plaintiffs, and evidence addressed to this is not within the rule. — 34 *Vt.* 565.

We submit that where, as in these cases, it is sought to bind a party by a written instrument not signed by him, it must be permitted to show that he did not accept it as such instrument.

The fact admitted goes directly to this point.

*e.* The defendant is lessee of the Detroit, Monroe and Toledo Road, whose franchise it exercises in carrying property from Toledo to Detroit. This road was built under the general railroad law.   We insist that defendant, in the use of this road, is governed and controlled in all respects by the provisions of this law, and that it is thereby prohibited from limiting its common law liability by contract. — 1 *Comp. L.* § 1992; 7 *Mich.* 410.

If this statute does not prohibit defendant from qualifying its liabilities by contract, it certainly does by mere usage, not amounting to contract.

4. A reasonable time for removal of the property was not afforded in either of these cases.

The McMillans received notice of the arrival of the tobacco and eggs, at half past three o'clock in the afternoon of the day of the fire.   The depot closed at six o'clock, affording them two hours and a half for removal of the property on that day.

They received no notice of the arrival of the wine and candles.

King received notice of the arrival of his goods at half past four o'clock in the afternoon of the day of the fire, leaving him one hour and a half for their removal.

Heffron & Parker received notice of the arrival of their goods in the forenoon of the day of the fire.

5. Defendant is liable as warehouseman.   The destruction of the property was caused by its gross negligence.

*a.* There is no fact in the cases in any degree qualifying defendant's liability as warehouseman, and the law defines this as follows:   He is bound to the exercise of such degree of care and diligence as prudence requires him to

bestow in regard to his own property. — *Edwards on Bailm.* 284; 28 *Vt.* 180.

The fact that defendant subjected its own property to the same dangers, is no answer to evidence of negligence in the care of plaintiff's property. — *Story on Bailm.* 64; 2 *Ad. and El.* 256; 1 *B. and Ald.* 59.

*b.* The explosive nature of the oils which caused the fire is a *notorious* as well as scientific fact. Wherever newspapers circulate, and are read, their dangerous character is known. It is an indisputable fact that the press chronicles a dozen accidents from explosion of these oils, to one from explosion of gunpowder.

Proof of facts within the common experience and knowledge of mankind is not necessary. Courts and juries will take notice of them. — 21 *N. Y.* 173.

The fact that defendant brought the oil over its road, and deposited it in the building, establishes its knowledge that it was there.

The negligence consists in this, that having this knowledge it nevertheless stored plaintiffs' property in the building.

*H. H. Emmons* and *W. Wing,* for defendants.

1. At common law and irrespective of the exemptions in the bills of lading, the defendant is not liable for the loss of goods without negligence after the transit is ended, and they are in store awaiting delivery to the consignee.—4 *Term,* 581; 5 *Id.* 389; 8 *Taunt.* 83; 8 *Id.* 443; 10 *Mees. and W.* 436; 7 *Com. B.* 839; 2 *Cromp. and J.* 218; 4 *Bing. N. C.* 314; 3 *Man. and Gr.* 643; 7 *Id.* 850; *Story on Bailm.* §§ 538–539, 445–450, 451–453; *Ang. on Carriers,* §§ 302, 303 and 304; *Edwards on Bailm. p.* 516, 518; *Redfield on R. W.* § 130; *Pars. on Cont.* 619; 2 *Kent,* 604; 10 *Met.* 472; 1 *Gray,* 263; 13 *Id.* 481; 4 *Allen,* 520; 11 *Id.* 297; 4 *Harrington,* 448; 20 *Ill.* 404; 20 *Id.* 407; 12 *Ind.* 55; 13 *Ill.* 574; 15 *Id.* 561; 18 *Iowa,* 556; 20 *Id.* 73; 30 *Penn. St.*

247; 9 *Barr*, 144; 11 *Rich.* (*Law*) 337; 16 *Vt.* 52; 32 *N. H.* 523; 6 *Hill*, 157; 9 *Barb.* 158; 10 *Id.* 620; 26 *Wend.* 591; 20 *N. Y.* 259; 25 *Id.* 304; 29 *Barb.* 35; 45 *Id.* 103; 35 *Vt.* 105; 29 *N. J.* 393; 6 *Mich.* 243.

2. The reception of the bills of lading by the consignors being such as they and the plaintiffs had long been accustomed to receive from the defendants and other companies constituting the line over which the goods were transported, creates *prima facie* a contract, notwithstanding they did not know of the exemptions they contained.—116 *E. C. Law* 1005; 13 *Weekly R.* 1049; 12 *Com. B.* 75; 10 *Com. B. N. S.* 453; 2 *Id.* 2 *Scott*; 17 *Com. B.* 575; 5 *H. and N.* 867; 8 *Mees. and W.* 444; 2 *Ellis and Blackb.* 750; 14 *Com. B.* 527; 13 *Ad. and Ellis*, 345; 16 *Upp. C. Q. B.* 389; *Ang. on C.* § 223; *See* § 466; 1 *Pars. on Cont.* 647; *Edwards on Bailm.* 490; 11 *N. Y.* 484; 6 *How.* 344; 45 *Barb.* 274; *5th Am. Law Register, Nov.* 1866, *p.* 7; 3 *Hill*, 8; 7 *Id.* 533; 2 *Id.* 623; 14 *Barb.* 524; 3 *Wallace*, 107; 11 *Cush.* 97; *Pierce on R. W.* 421; 1 *Daily*, 227; 3 *Kansas*, 205; 6 *Harris and J.* 394; 1 *Daily*, 575; 2 *Rich.* 296; *Dudley*, 162; 6 *W. and S.* 500; 20 *Miss.* 599; 8 *Barr*, 479; 8 *Pick.* 392; 20 *Me.* 275; 1 *Met.* 84; 8 *Pick.* 92, 93; 9 *Mass.* 512; 3 *Esp.* 42; 18 *Pick.* 511; *See* 2 *Met.* 180; 1 *Id.* 121; 14 *Pick.* 424; 2 *Sandf. Ch.* 251; 46 *Barb.* 350; 1 *E. D. Smith*, 140; 2 *Cush.* 80; 6 *Mich.* 243; 25 *N. Y.* 442.

*a.* That the consignors are presumed to have authority to make the agreements contained in these bills of lading.— See *Angell on Carriers*; *Story on Bailm.*; *Abbott on Ship. Supra.*; 3 *Wallace*, 150; 1 *Kern.* 481; 1 *Dailey*, 227; 3 *Kansas*, 20; *Law Register*, 1865, *p.* 9; 7 *Hurlst. and Norm.* 400; 1 *Stark.* 75; 1 *Saund. Pl. and Ev.* 387.

*b.* The party sending goods over a line is conclusively presumed to know its usages and modes of business. Notices limiting its liabilities, altering the law in reference to its acts, or usages, or modes of business, the carrier must bring home to the party, in order to bind:

*Edwards on Bailm.* 534, 503, says that usages are equally binding on the party; whether known or not he is presumed in law to know.— 6 *Hill*, 158; 3 *Allen*, 84, *and cases cited*; 30 *Penn.* 253; 4 *Burr.* 2300; *Red. on R. W.* 296, *note*; 4 *Am. Law R.* 234.

3. If there is any fraud, accident or mistake, whereby unknown terms have been imported into the agreement, or if there has been any oppression or unconscionable advantage taken of circumstances of haste, inadvertence or ignorance on the part of the plaintiffs, then the remedy is in a court of equity only.—116 *E. C. Law* 1020; 2 *Phil. Ev.* 645, (*Ed. of* 1859); 2 *Id.* 698, 653; *Story's Eq. Jur.* § 110; *Id.* §§ 146, 147, 150, 160, 750, 769, 769 (*a*), 770, 775; *Willard Eq. Jur.* 73; 34 *Vt.* 566.

4. The exemptions in the bills of lading are lawful, and protect the defendant even if it could be made to appear the goods were destroyed by negligence.—116 *E. C. Law*, 1065; 35 *Law. Jur. N. S.* 123; 4 *Hurl. and Norm.* 327; 1 *Id.* 63; 7 *Exch.* 707; *see per Martin B.* 715; 24 *Up. C. Q. B.* 544; 23 *Id.* 427; *Id.* 604; 15 *Up. C. C. P.* 315; 15 *Com. B. N. S.* 583; 25 *N. Y.* 442; 13 *Barb.* 353; *see* 3 *Sel.* 475; 2 *Comst.* 204; 4 *Seld.* 375; 24 *N. Y.* 281, 196, 222; 11 *Id.* 484; 5 *Am. Law Reg.* 460; 10 *Ohio St.* 65; 3 *Wallace*, 150; 6 *Mich.* 256; 5 *Id.* 368; 10 *Ohio St.* 65.

5. The bills of lading constitute the contracts governing the entire transit, although made in form with the corporation at the commencement of the route.

We do not go so far as to ask an adoption of the English rule, which would hold, probably even under these bills, that the first contractors were carriers through. See 5 *H. and Norm.* 979; *B. and C. Co. v. Collins, House of Lords*; *S. C.* 1 *H. and N.* 517; *S. C.* 11 *Exchg.* 790; and in this country 19 *Wis.* 336; *Martin v. Exp. Co. and cases cited*; 1 *Hilton*, 226; 3 *Sandf.* 610; 9 *Barb.* 117; 19 *Wend.* 534; 6 *Am. Law Reg. N. S.* 867; 4 *Seld.* 37; 33 *Ill.* 118, *and cases cited.* And see the discussion by Judge Redfield, quoted by us, *ante*

Point 3, where he refers to a part of the American cases, deciding that the contracts of expressmen to forward goods make them carriers, although they use vehicles of others. That they take pay and agree for a rate though they are carriers through. The use of the word forward does not alter the legal effect. There is a difference, however, between the English and American doctrine, even where the rule of the former, in this respect, has been adopted. It is here held that, although the agreement of the first carrier is one to deliver at the place of ultimate consignment, still there is no such want of privity between the owner and the succeeding ones as to prevent suit upon it against them.— See *Redfield on R. W.* 239; 2 *Greenlf.* 210. There are numerous American cases besides those cited by Mr. R. What we say, then, is not that there can be no remedy against us upon these agreements, because they are bargains with another, and because we are but sub-contractors under them. But that what we have done as parties to the same general undertaking entitled us to the conditions at the same time, and for the same reasons which compel us to accept the rates and transport in the mode and subject to the risks stipulated for. When there are no exemptions in the first carrier's bills upon the facts here stated, we concede our own local usages will not protect us, and we carry the goods mentioned in them under a common law liability.

6. The sixteenth section of the defendant's charter provides that it shall be liable only as warehouseman for goods awaiting delivery; and that section will regulate the liability in this action.

The claim on part of plaintiffs is that as this loss occurred in a depot upon the line of the Detroit, Monroe and Toledo Railroad Company, the obligations of the defendant will depend upon the charter of that company.

If the plaintiffs had sued that company such might have been the result. The lessor is still liable for wrongs committed upon its road, if it suffers others to work and run it.—17 *How.* 30.

MᴄMɪʟʟᴀɴ ᴇᴛ ᴀʟ. *v.* M. S. & N. I. R. R. Co.

The following cases discuss the right of lessors and lessees of railways, and their respective obligations to third persons. It fully appears suit might have been brought against either company. — *See Pierce on R. W.* 244; *Redfd. on R. W.* 424, 431, 435, § 184; 9 *Cush.* 30; 1 *Allen,* 9; 8 *Id.* 441; 13 *Wis.* 637; 29 *Vt.* 423; 6 *Henlst. and Norm.* 736, *and note.*

The record shows that the defendant operates the road by its own officers. None of the organism, powers or franchises of the Detroit company are employed. A portion of its property only is leased. The charter of the defendant defines its powers, and the conditions upon which it may exercise them. The law authorized it to receive a lease of an additional road; not to take possession of the offices, franchises and government of the company owning it.

The true distinction is this: Everything which measures the extent of the property rights, the width of the road, the mode of use, if any be prescribed, speed, ringing of bells, and all which regulates the manner of enjoyment, depends upon the law under which the thing leased has been created. They define and constitute part of itself. But obligations springing from the use depend upon the charter of the company authorized by law to use it. These depend upon contracts which are to be made, or upon acts which can be done only in virtue of the law creating the active company.

Cᴏᴏʟᴇʏ J.

The first question to be considered in this case is, whether the defendants, in respect to the business transacted by them on the line of the Detroit, Monroe and Toledo Railroad, are subject to the liabilities imposed by the general railroad law of the state, under which the road named was constructed, or may claim the benefit of such exemptions as are contained in their original charter. As the charter expressly provides that for goods in deposit awaiting

delivery, the company shall be liable as warehousemen only — *Laws* 1846, *p.* 185 — and contains no prohibitory clauses which would prevent their making any contract which it is lawful for a common carrier to make, while the general law prohibits any company formed under it from lessening or directly or indirectly abridging their common law liability as carriers — *Comp. L.* § 1992 — it is possible that important consequences may depend upon the determination of this question.

The doubt, if any, springs from that provision in the general railroad law which authorizes any railroad company in the state to "make any arrangements with other railroad companies, within or without this state, for the running of its cars over the road of such other company, or for the working and operating of such other railroads as said companies shall mutually agree upon." — *Comp. L.* § 1993. The defendants are lessees of the Detroit, Monroe and Toledo road, and while they admit that all those provisions of the general railroad law which measure the extent of property rights, prescribe the width of the road, the mode of use, speed, ringing of bells, or the manner of enjoyment, must be applicable to them as lessees, as defining and constituting a part of the right itself, yet they claim that *obligations* springing from the use depend upon their own charter, under which alone the contracts are to be made or the acts done from which the obligations spring.

I have been unable to discover anything in the general railroad law which supports this distinction, or which indicates an intention on the part of the legislature that the lessee of a road, constructed under that law, should take the road discharged of any of the conditions or burdens imposed for the benefit of the public upon the lessor. The authority to "work and operate" the road of a corporation does not necessarily imply that the operating is to be otherwise than under the obligations imposed upon the corporation by its charter; and as grants of corporate franchises are to be

construed with strictness — 2 *Kent,* 298; *Charles River Bridge v. Warren Bridge,* 11 *Pet.* 544; *Perrine v. Chesapeake and Delaware Canal Co.* 9 *How.* 172; *Bradley v. N. Y. and N. H. R. R. Co.* 21 *Conn.* 294; *Chenango Bridge Co. v. Binghamton Bridge Co.* 27 *N. Y.* 87, *and* 3 *Wallace,* 51 — we are not at liberty to infer an intent in the legislature to relieve the road in the hands of the lessee from obligations resting upon the lessor, unless such intent is clearly expressed, or at least is necessarily to be inferred. There is no such clear expression in the present case, and the inference, I think, is against any such intent. The legislature, by the general law, established the rules under which they would allow new roads to be constructed and operated; and when they gave permission to the proprietors to lease them to others, it is to be presumed, in the absence of any declaration to the contrary, that the intention was not to dispense with those regulations which they have judged important for the public interest and protection.

The power to lease does not imply the power to transfer greater rights than the lessor himself possesses; and where the obligations assumed by the lessor, pertaining to the management of his business, and the liabilities which should spring therefrom, were the consideration upon which the franchise was granted, it would be a violent inference that the Legislature designed to waive them when they are no less important to the public protection after the lease than before.

I think, therefore, that the liability which rests upon these defendants is that of the Detroit, Monroe and Toledo Railroad Company, which by law is not permitted to lessen or abridge its common law liability as common carriers. What that liability is when they have transported property over their road and deposited it in their warehouse to await delivery to the consignee is the next question demanding consideration.

On this point three distinct views have been taken by different jurists, neither of which can be said to have been

so far generally accepted as to have become the prevailing rule of the courts.

*First:* That when the transit is ended, and the carrier has placed the goods in his warehouse to await delivery to the consignee, his liability as carrier is ended also, and he is responsible as warehouseman only.   This is the rule of the Massachusetts cases— *Thomas v. Boston and Providence R. R. Co.* 10 *Met.* 472, *and Norway Plains Co. v. Boston and Maine R. R. Co.* 1 *Gray,* 263 — and those which follow them.

*Second:* That merely placing the goods in the warehouse does not discharge the carrier, but that he remains liable as such until the consignee has had reasonable time after their arrival to inspect and take them away, in the common course of business. — *Morris and Essex R. R. Co. v. Ayres,* 5 *Dutch.* 393; *Blumenthal v. Brainerd,* 38 *Vt.* 413; *Moses v. Bost. and Me. R. R.* 32 *N. H.* 523; *Wood v. Crocker,* 18 *Wis.* 345; *Redf. on Railw.* 3d *Ed.* § 157.

*Third:* That the liability of the carrier continues until the consignee has been notified of the receipt of the goods, and has had reasonable time, in the common course of business to take them away after such notification. — *McDonald v. W. R. R. Corp.* 34 *N. Y.* 497 *and cases cited;* 2 *Pars. on Cont. 5th Ed.* 189; *Ang. on Carriers,* § 313; *Chitty on Carriers,* 90.

The rule as secondly above stated, proceeds upon the idea that the consignee will be informed by the consignor of any shipment of freight, and that it then becomes the duty of the former to take notice of the general course of business of the carrier, the time of departure and arrival of trains, and when, therefore, the receipt of the freight may be expected, and to be on hand ready to take it away when received.  It is assumed to be simply a question of reasonable diligence with the consignee whether he ascertains the receipt of his consignment or not; the regularity of the trains being such as to leave him without reasonable excuse if he fails to inform himself.

There may be railroad lines in the country where the application of this rule would do injustice to no one. If the business is not so great but that freight trains can be run with the same regularity as those for passengers, and the freight can always be sent forward immediately on being received for the purpose, a notice from the consignor will usually apprise the consignee with sufficient certainty when the goods may be expected. But on the long through lines such regularity is quite impracticable. Freight must be sent forward from the carrier's warehouse with a promptness depending upon the pressure of business; or, in other words, as it may suit his convenience and his interest to forward it. This may be many days, or even weeks after its receipt, or it may be immediately. It is not always in the power of the carrier to give reliable information upon the subject, and unavoidable delays will frequently intervene after the transit has commenced. To require the consignee to watch from day to day the arrival of trains, and to renew his inquiries respecting the consignment, seems to me to be imposing a burden upon him without in the least relieving the carrier. For it can hardly be doubted that it would be less burdensome to the carrier to be required to give notice than to be subjected to the numberless inquiries and examinations of his books which would otherwise be necessary, especially at important points.

The rule that the liability of the carrier shall continue until the consignee has had reasonable time after notification to take away his goods, is traceable to certain English decisions having reference to carriers by water, whose mode of doing business resembles that of railroad companies in the inability to proceed with their vehicles to every man's door, and there deliver his goods. It is a modification in favor of the carrier by land of the obligation formerly resting upon him, and which required, in the absence of special contract, an actual delivery to the consignee of the goods carried. The modern modes of transportation render this impracticable, unless the carrier shall add to his business that of

drayman also, which is generally a distinct employment. In lieu of delivery, therefore, the carrier is allowed to discharge himself of his extraordinary liability by notifying the consignee of the receipt of the goods, who is then expected, in accordance with what is an almost universal custom, to remove them himself. It is insisted, however, that this rule, so far as it can be considered established by authority, is applicable only to carriers who have no warehouses of their own, but make the wharf or platform their place of delivery, and who therefore never become warehousemen, and are held to a continued liability as carriers, as the only mode of insuring watch and protection over the goods until the owner can have opportunity to receive them. This distinction would not be entirely without force, and would seem to be acted upon in one state at least: Compare *Scholes v. Ackerland,* 13 *Ill.* 574, *and Crawford v. Clark,* 15 *Id.* 561, *with Richards v. M. S. and N. I. R. R. Co.* 20 *Id.* 404, *and Porter v. same,* 20 *Id.* 407. See, also, *Chicago and R. I. R. R. Co. v. Warren,* 16 *Id.* 502, where a railroad company was held to the same measure of responsibility as a carrier by water, where the property carried, instead of being placed in their warehouse, was left outside.

But it may well be doubted whether the distinction rests upon sufficient reasons. The man who sends his goods by railroad, and who desires to receive them as soon as they reach their destination, has commonly no design to employ the railroad company in any other capacity than that of carrier. If any other relation than that is formed between them, it is one that the law forms, upon considerations springing from the usages of business, and having reference to the due protection of the interests of both. The owner wants storage only until he can have time to remove the goods; and the warehousing is only incidental to the carrying. Payment for the transportation is payment also for the incidental storage. The owner has been willing to trust the company as carriers because the law makes them insurers; but he might not be willing to trust them as warehousemen under a liability so greatly qualified, and in a

McMillan et al. v. M. S. & N. I. R. R. Co.

trust which implies generally a considerable degree of personal confidence. As what he desires is, not to have the goods remain in store, but to receive them personally as soon as they can be carried, and as the railroad company, if they had no warehouse, would continue to be liable as carriers until the lapse of a reasonable time after notification, it would seem that if the company can claim any exemption from their liability as insurers, it must be upon the ground that the erection of warehouses is for the benefit, not of the company, but of the public doing business with them, and to facilitate delivery. But this, as appears to me, would be taking a very partial and one-sided view of the purpose of these structures.

If the road has no warehouse, the cars must remain standing on the track until the owner can come and receive his goods, or, if they are unloaded, the company must not only establish a watch to prevent thefts, but at their peril must protect against injuries by the elements. Landing the goods on the platform, it is agreed on all hands, does not alone discharge the carrier. And it seems to me that a consideration of the immense carrying trade of the country will force one to the conclusion that it cannot possibly be either properly, expeditiously, or profitably done except with the conveniences afforded by the railroad warehouses, which afford the easiest, cheapest and most effective means by which carriers are enabled to protect themselves against losses in that capacity.

At the great centers of commerce, it would be impossible to transact the amount of business now done, if the cars must stand upon the track until the goods carried can be delivered from thence to the consignees. Unloading them in immense quantities upon open platforms would expose them to destruction. At the less important points the same thing is true, but in less degree. It would seem, therefore, looking only to the interest of the carriers, that the reasons which require the construction of warehouses are imperative.

McMILLAN ET AL. v. M. S. & N. I. R. R. Co.

Only by means of them can they keep their tracks clear for trains, or protect against the destruction of goods of which they are insurers. And wherever the business is large, warehouses are required also, to enable the companies to carry out a system of separation and classification of goods received, without which it would be quite impossible to conduct the business with facility or profit. The warehouses are also absolutely essential in connection with the receipt and dispatch of goods to be sent from each point, and in respect to which the railroad company are unquestionably liable as carriers from the time of their receipt. In every view, therefore, they seem indispensible to the business of the carrier; and being constructed with reference to it, they are properly nothing more than an extension of the platforms upon which the companies receive and deliver goods, with walls and roofs added to facilitate, guard, and to protect against injuries by the elements.

The interest, on the other hand, which the consignee has in the warehouse, is much less direct and important. It may facilitate the delivery of goods, but the carrier is liable if he fail to deliver in reasonable time. The risk of loss and injury will be less, but against these the carrier insures. In no proper sense can the warehouse be said to be for his accommodation; and if the obligations of the carrier to him are to be diminished by its erection, he might well prefer that it should not be built. The rule which changes the carrier into a warehouseman against the will of the owner of the property, on the ground solely that he has erected convenient structures for the storage, but which structures are absolutely essential to his business as carrier, seems to me to be a departure from the rule of the common law upon reasons which do not warrant it. It is a rule which allows the insurer to absolve himself from obligations to the insured, by supplying himself with conveniences for the transaction of his business, and with the means of protection against loss or damage.

A critical examination of the cases on this subject would scarcely be useful. As they can not be reconciled, the court must follow its own reasons. I am unable to discover any ground which to me is satisfactory, on which a common carrier of goods can excuse himself from personal delivery to the consignee, except by that which usage has made a substitute. To require him to give notice when the goods are received, so that the consignee may know when to call for them, imposes upon him no unreasonable burden. If, by understanding with the consignee, the goods were to remain in store for a definite period, or until he should give directions concerning them, the rule would be different, because the relation of warehouseman would then be established by consent. In the absence of such understanding, sound policy, I think, requires the carrier to be held liable as such until he has notified the consignee that the goods are received. If the nature of the bailment then becomes changed through the neglect of the consignee to remove the goods, it will be by his implied assent. Such a rule is just to both parties and burdensome to neither, and it will tend to promptness on the part of carriers in giving the notices, which, whether compulsory or not, are generally expected from them.

Whether the clause in the General Railroad Law forbidding companies formed under it from lessening or abridging their common law liability as carriers, prevents their entering into contracts by which their employers release them from any of their liability, is not clear upon the terms of the clause itself. Such contracts are not expressly forbidden, and the general tendency of legislation in modern times has been to relax, rather than to render more severe, the strict rules of the common law in regard to carriers, of which our own state presents an example in the legislative exemption of the principal companies from liability as carriers for goods in their warehouses awaiting delivery. And a clause which should forbid parties from entering into any

such agreements with carriers as they might conceive to be for their interest, would hardly be looked for in the general law, unless strong reasons were known to have existed for its adoption.

When that law was passed, a controversy had been going on between common carriers and the public in respect to the notices given by the former, by public advertisement and otherwise, by which they sought to relieve themselves from some portion of their common law liability, whether those employing them assented or not. The courts in this country had generally held these notices ineffectual; but they still continued to be given, and to be insisted upon as possessing legal force. I do not perceive in the clause in question any intention to go further than to put an end, by the fundamental law of these organizations, to any further controversy upon that ground. In view of the extent to which the courts had gone in England, in giving force to such notices, no one can say that the precaution was needless. The companies are forbidden to lessen or in any way abridge their liabilities as common carriers, but the person sending goods by them is not forbidden to release them from such liabilities, or from any portion thereof, for any consideration which to him is satisfactory. In other words, the law compels these companies at all times, at the option of those sending goods by them, to carry the goods as insurers. If, on the other hand, the carriers can make it for the interest of the party to relieve them from this liability wholly or in part, a contract to that effect, if fairly made, and embracing no unreasonable conditions, is not opposed to public policy; and to forbid it would seem an unnecessary restraint upon freedom of action.— See *Bissell v. N. Y. C. R. R. Co.* 25 *N. Y.* 448. The distinction between a *restriction* by the carrier himself, and a contract by which another party releases him from obligations, was pointed out by this court in *Michigan Central R. R. Co. v. Hale,* 6 *Mich.* 243, and is the same which is applicable

here.    Many things are transported by railroad in respect
to ¦ which it may be for the mutual interest of both par-
ties that special contracts be made.    Live stock are usu-
ally accompanied and cared for by the owner or his agent,
under special agreements, and in some other cases the owner
prefers to assume such general oversight and control as is
inconsistent with the full common law liability of the car-
rier.    It has not been generally supposed that the clause
under consideration forbade special contracts in such cases;
and the Legislature of 1867 must have considered them
lawful when they provided that all contracts modifying the
common law liability of railroad companies as carriers should
be wholly in writing—*Laws* 1867 *p.* 165.    This enactment
was evidently designed not to enlarge the powers of rail-
road companies, but to impose restraints upon an existing
authority to make contracts.

A much more difficult question is, what shall consti-
tute the proof of a contract, in the absence of distinct
evidence that the parties have consulted and agreed upon
terms.    The practical difficulty, amounting almost to an
impossibility, of bringing the carrier and his employer to-
gether on every occasion for the discussion of terms, has
led to the adoption by carriers of a printed form of con-
tract, which is put into the hands of the consignor, and
by its terms purports to bind him to its conditions; but
it is strongly insisted that there ought to be more satis-
factory evidence of assent on the part of the consignor
to modify any of his common law rights, than is derived
from the mere receipt of a paper from the carrier, framed
to suit the interest of the latter, and which the consignor
may never have read.

There are some matters in respect to which the carrier
may qualify his liability by mere notice.    Mr. Greenleaf says:
"It is now well settled that a common carrier may qual-
ify his liability by a general notice to all who may em-
ploy him, of any reasonable requisition to be observed on

their part, in regard to the manner of delivery and entry
of parcels, and the information to be given to him of their
contents, the rates of freight, and the like; as, for ex-
ample, that he will not be responsible for goods above the
value of a certain sum, unless they are entered as such,
and paid for accordingly."—2 *Greenl. Ev.* § 235; see *West-
ern Transportation Co. v. Newhall,* 24 *Ill.* 466. These are
but the reasonable regulations which every man should be
allowed to establish for his business, to insure regularity
and promptness, and to properly inform him of the respon-
sibility he assumes. And it has been held that notice de-
rived from the usage of the carrier may determine the
manner in which he is authorized to make delivery.—
*Farmers and Mechanics Bank v. Champlain Trans. Co.* 16
*Vt.* 52; *same case,* 18 *Id.* 131, *and* 23 *Id.* 186. But be-
yond the establishment of such rules, the force of a mere
notice cannot extend. Subject to reasonable regulations,
every man has a right to insist that his property, if of
such description as the carrier assumes to convey, shall be
transported subject to the common law liability. "A com-
mon carrier has no right to refuse goods offered for car-
riage at the proper time and place, on tender of the
usual and reasonable compensation, unless the owner will
consent to his receiving them under a reduced liability;
and the owner can insist on his receiving the goods un-
der all the risks and responsibilities which the law annexes
to his employment."— *Pierce on Railroads,* 416. See *Hollis-
ter v. Nowlen,* 19 *Wend.* 234; *Cole v. Goodwin,* 19 *Id.* 251;
*Jones v. Voorhees,* 10 *Ohio,* 145; *Bennett v. Dutton,* 10 *N.
H.* 487; *N. J. Steam Navigation Co. v. Merchants Bank,* 6
*How.* 382; *Moses v. Boston and Maine R. R. Co.* 24 *N. H.*
71; *Kimball v. Rutland and Burlington R. R. Co.* 26 *Vt.*
256; *Slocum v. Fairchild,* 7 *Hill,* 292; *Dorr v. N. J. Steam
Navigation Co.* 4 *Sandf.* 136, *and* 11 *N. Y.* 485; *Michigan
Central R. R. Co. v. Hale,* 6 *Mich.* 243. The fact that a
restrictive notice is shown to have been actually received

or seen by the owner of the goods will not raise a presumption that he assents to its terms, since it is as reasonable to infer that he intends to insist on his rights as that he assents to their qualification; and the burden of proof is upon the carrier to establish the contract qualifying his liability, if he claims that one exists.— *N. J. Steam Navigation Co. v. Merchants Bank,* 6 *How.* 382 *per Nelson J.*

The evidence of such a contract in the present case consists, *first* of the defendant's mode of doing business, and, *second,* of what are called in the case, bills of lading, and which contain the supposed limitations. It is admitted by the plaintiffs that all the bills of lading in use by these defendants, and all the contracts of affreightment, the instructions to agents, and the printed rules posted in all the depots and station houses of defendants for the past ten years have contained clauses exempting them from liability for loss by fire, and providing that when goods are in the depot awaiting delivery to consignees, the company will be liable as warehousemen only, and not as carriers; and that plaintiffs have been accustomed to do business with defendants, and to receive and send goods over their road under bills of lading of this description.

There are several reasons why knowledge in plaintiffs of defendant's usage to make restrictive contracts cannot control the present case. In the first place, knowledge of such usage can in no case of the kind be allowed force beyond that which could be given to notice of an intention on the part of the carrier to restrict his liability, brought home to the party in any other mode; and we have already seen that the force of such notices is exceedingly circumscribed. And it can hardly be seriously claimed that the plaintiffs, by accepting restrictive contracts in some cases, have thereby debarred themselves from insisting upon their common law rights thereafter. In the second place, the defendants have no power under the law to establish a usage restricting their liability; as that would come

directly in conflict with the clause in the General Railroad Law heretofore quoted. And in the third place, if this were otherwise, the usage would be irrelevant to the present case, since the proof relates to dealings between the parties to this suit at Detroit, and to usages understood by the plaintiffs there, while the contracts here in question were in each instance made with consignors at a distance, and in most cases by other railroad companies whose usages do not seem to be uniform.

It remains to be seen whether the conditions embodied in the bills of lading are to be treated as a part of the contract for transportation and to be regarded as assented to by the consignors, notwithstanding they may not have read them.

A bill of lading proper is the written acknowledgment of the master of a vessel that he has received specified goods from the shipper, to be conveyed on the terms therein expressed to their destination, and there delivered to the parties therein designated.—*Abbott on Shipping*, 322. It constitutes the contract between the parties in respect to the transportation; and is the measure of their rights and liabilities, unless where fraud or mistake can be shown.— *Redf. on Railw.* 307–309 *and notes*; *Ang. on Carriers* § 223. It has acquired from usage a negotiable character, and the carrier may be estopped, as against the indorsee for value, from showing mistakes in giving it.— *Redf. on Railw.* 307. Whether the contracts which railroad companies are accustomed to give on the receipt of goods for transportation, and which are usually called by the same name, are subject to all the same incidents as the bills of lading proper, we need not now consider; but it will not be disputed that they fix the rights and liabilities of the parties when their terms have been agreed upon, and it is, I think, the weight of authority, and certainly the rule in this state, that the carrier may stipulate in them

for a limitation of his common law liability.—*Michigan Central R. R. Co. v. Hale*, 6 *Mich.* 243.

Bills of lading are signed by the carrier only; and where a contract is to be signed only by one party, the evidence of assent to its terms by the other party, consists usually in his receiving and acting upon it. This is the case with deeds-poll, and with various classes of familiar contracts, and the evidence of assent derived from the acceptance of the contract, without objection, is commonly conclusive. I do not perceive that bills of lading stand upon any different footing. If the carrier should cause limitations upon his liability, to be inserted in the contract in such a manner as not to attract the consignor's attention, the question of assent might fairly be considered an open one—*Brown v. Eastern R. R. Co.* 11 *Cush.* 97; and if delivery of the bill of lading was made to the consignor under such circumstances as to lead him to suppose it to be something else—as, for instance, a mere receipt for money—it could not be held binding upon him as a contract, inasmuch as it had never been delivered to and accepted by him as such—*King v. Woodbridge*, 34 *Vt.* 565. But except in these and similar cases, it cannot become a material question whether the consignor read the bill of lading or not. The ground upon which it is claimed that this becomes important, seems to be, that parties generally receive these contracts without reading them or inquiring into their terms—taking whatever the railroad companies see fit to give them, and that they are thus liable to be imposed upon and defrauded, unless the courts interfere to protect them. Or, if we may be allowed to state the same thing in different words, as everybody is negligent in these matters, and will not give the necessary attention to their contracts that is essential to the protection of their interests, the courts must interfere to set them aside wherever extraneous evidence of actual assent is not produced. If

the courts possess any such power, and it is expedient
to exercise it, it may be important to consider, at the
outset, whither it will lead us.    Bills of lading are not
the only contracts that are received in this careless way.
Deeds, mortgages, and bills of sale are every day given
and received without being read by the parties, though
they may contain provisions which have not been the sub-
ject of special negotiation.    Policies of insurance, which
more nearly resemble the instruments now in question,
are still more often received without examination.    In the
absence of fraud, accident or mistake, no one ever supposed
it was competent for the courts to reform such instruments
in behalf of a party who would not inform himself of their
purport.    Nothing would be certain or reliable in business
transactions, if contracts were liable to be set aside on
grounds like these.    The law does not assume to be the
guardian of parties *compotes mentes* in respect to the lawful
contracts which they may make, but it proceeds upon the
idea that where fraud has not been practiced, and mistake
has not intervened, the general interests of community are
best subserved by leaving every man to the protection of his
own observation and diligence.

It is argued that the consignor had no occasion to ex-
amine the bill of lading, because he had a right to suppose
it recognized the common law liability.    But the common
law does not establish the rates of freight, or the place of
delivery;    and for stipulations respecting these, at least,
every man must examine his bill of lading.    Moreover, we
cannot overlook the facts that a large proportion of these
instruments are issued with restrictive clauses, and that car-
riers arrange their tariffs of freights in the expectation that
they will be accepted.    These facts are so well understood
that a person exercising ordinary diligence in his own, af-
fairs, would not be likely to accept one of these instruments
without examination, if he expected to hold the carrier to
the liability which would rest upon him in the absence of
special contract.

I do not find any case in which a court has assumed to set aside such a contract on the ground that the party had failed to read it. An exemption from liability from losses arising from specified causes, when embodied in the bill of lading, has been frequently recognized as a part of the contract, though it did not distinctly appear to have been brought to the consignor's notice — *Davidson v. Graham,* 2 *Ohio N. S.* 131; *Parsons v. Monteath,* 13 *Barb.* 353; *York Co. v. Central R. R. Co.* 3 *Wall.* 107; *Dorr v. N. J. Steam Nav. Co.* 11 *N. Y.* 491; and in the case last referred to, it is said that the exemption, when embodied in the bill of lading, must be deemed to have been assented to by the parties. The same presumption would seem to have been acted upon in *Moore v. Evans,* 14 *Barb.* 524; *Kallman v. Ex. Co.* 3 *Kans.* 205, *and Whitesides v. Thurlkill,* 20 *Miss.* 599; and it is in accordance with the general rule applicable to written contracts.

It is said, however, that these special contracts must be held void for want of consideration, unless it is shown that, in return for the release of the carrier from his extraordinary liability, he on his part has made a deduction in the rates of freight. What does appear in the present case is, that the carrier, in consideration of the promise by the consignor to release him from certain liabilities, and to pay him certain moneys, agrees on his part to carry the goods for the sum named. I do not see how we can assume that the charges are the same that they would have been, had the release been omitted. If by the charter of a railroad corporation maximum rates had been established, and the corporation had attempted to charge these rates for a restricted liability, a case would be presented coming within the principle of this objection — *Bis. v. N. Y. C. R. R. Co.* 25 *N. Y.* 449, *per Selden J;* but no such case is before us here, and a consideration appears which, for aught that is shown by the record, is sufficient.

It was also said on the argument, that a rule such as we have now laid down, would place the public at the mercy of the railroad companies, who would refuse to give any other than restricted bills of lading. It is enough for us to say, in this case, that railroad companies chartered as common carriers have no such power, and the consignor can assent to the restriction in each instance, or refuse to assent at his option. If the corporations decline to transport goods as common carriers, when that is the condition upon which they hold their franchises, there would be no difficulty, I apprehend, in applying the proper remedy.

It will now be necessary to examine the various bills of lading, in reference to the particular limitations which they contain. Two of those given by the Cincinnati, Hamilton and Dayton R. R. Co. contain no restrictions: the other excepts against liability for " unavoidable accidents and fire in depot." Those issued by the defendants contain, among others, a similar exception. It is claimed by the plaintiffs that these and similar exceptions will not shield the defendants, because the loss in the present case was the result of the negligence of their officers or servants, against liability for which it was not lawful for them to contract.

Whether the rule that a carrier, on grounds of public policy, is not to be permitted to contract for exemption from liability for his own negligence ( *Fairchild v. Slocum,* 19 *Wend.* 329; *York Company v. Central R. R. Co.* 3 *Wall.* 113; 3 *Pars. on Cont. 5th Ed.* 249 ), can properly be so extended as to prevent corporations contracting against liability for the negligence of their officers or servants, or any classes of them, and if not, then whether the general words of exemption here employed ought to be construed to embrace the negligence of such officers and servants ( *Wells v. N. J. Steam Nav. Co.* 8 *N. Y.* 379; *Schieffelin v. Harvey,* 6 *Johns.* 179; *Alexander v. Greene,* 7 *Hill,* 533 ), are questions I do not care to discuss in this case, inasmuch as I think no such negligence is shown. What was relied upon,

was the fact that barrels of benzine were carried over the road of defendants, landed in their depot at Detroit, and then passed over to the Detroit and Milwaukee Railroad Company, which occupied the other end of the same warehouse; that some of these barrels were in a leaky condition; and that while being handled by the employees of the latter company the escaping gas took fire from a lantern, and resulted in the destruction of the warehouse and its contents. From this it appears that the fire took place after the inflammable fluid had passed out of the hands of the defendants. The fact that they had carried it over their road had nothing to do with its ignition. If it should be conceded to be negligence in the company to receive so dangerous an article among their freights, yet if no loss resulted while it remained in their custody, it would be difficult to hold them responsible for accidents happening from its subsequent handling. When the Detroit and Milwaukee company received it upon their premises, it was of no consequence from whence it came, and any accident which might result would have no relation to the source from which it was received. It would be as legitimate to hold a merchant responsible from whom it might have been bought, as the carrier from whom it had been accepted. If we are to trace causes back, we need not stop at the preceding carrier, but, with similar reason, might hold the man liable who made the leaky barrels, or the person from whom the first carrier received them filled. The law can only look at the proximate causes of an injury, and not at those remote circumstances that may have contributed to those causes— *Olmsted v. Brown,* 12 *Barb.* 657; *Butler v. Kent,* 19 *Johns.* 223; *Whately v. Murrell,* 1 *Strob.* 389; *Matthews v. Pass,* 19 *Geo.* 141; *Platt v. Potts,* 13 *Ired.* 455.

Some question was made on the argument whether the consignors can be held, in the absence of explicit evidence on the subject, to have authority to enter into special contracts with the carrier which shall be binding on the

consignee. His authority, I think, is to be presumed; and the carrier is under no obligation to inquire into it. *Moriarty v. Harnden's Exp.* 1 *Daly*, 227. It is a question of more difficulty whether the Ohio bills of lading would govern the transportation for the whole route. By their terms the Cincinnati, Hamilton and Dayton Railroad Company acknowledge the receipt of the goods in good order, to be delivered in like good order "at Toledo for Detroit," unto the plaintiffs or their assigns, they paying freight. No evidence is given of any custom that these contracts shall govern the whole distance; nor does the case show whether the rates of freight specified are for the delivery at Toledo or at Detroit. The words employed only import that the goods are to be · carried to Toledo, and from thence forwarded; and in the absence of any special custom on the subject, it would seem that the company giving these bills fully discharged their duty when they had delivered the goods to the defendants at Toledo.

There are a number of English cases in which it has been held, where carriers received goods, and gave receipt therefor which specified that they were received to be sent to a point beyond their line, and there delivered to the consignee, that the contract was one for transportation the whole distance, upon which the first carrier might be sued for a loss occurring after the goods had passed out of his hands.— *Muschamp v. Lancaster R. R. Co.* 8 *M. and W.* 421; *Collins v. Bristol and Exeter R. R. Co.* 11 *Exch.* 790; *same case in House of Lords*, 5 *H. and N.* 969. The same ruling has been made in this country, where the carrier had expressly agreed to carry to a point beyond his line, for a compensation specified.— *Wilcox v. Parmelee*, 3 *Sandf.* 610; *Mallory v. Burrett*, 1 *E. D. Smith*, 234; *Noyes v. R. and B. R. R. Co.* 27 *Vt.* 110. But the doctrine generally accepted by the American courts is, that where a carrier receives goods marked for a particular designation beyond his line, and does not expressly undertake to deliver them

at the point designated, the implied contract is *only* to transport over his own line and forward from its terminus. — *Ackley v. Kellogg,* 8 *Cow.* 223; *Van Santvoord v. St. John,* 6 *Hill,* 157; *Hood v. N. Y. and N. H. R. R. Co.* 22 *Conn.* 1; *Elmore v. Naugatuck R. R. Co.* 23 *Conn.* 457; *F. and M. Bank v. Champlain Trans. Co.* 23 *Vt.* 209; *Brintnall v. Saratoga R. R. Co.* 32 *Id.* 665; *Nutting v. Connecticut River R. R. Co.* 1 *Gray,* 502; *Briggs v. Boston and Lowell R. R. Co.* 6 *Allen,* 246; *Perkins v. Portland and Saco R. R. Co.* 47 *Me.* 573; *American note to* 11 *Exch.* 797. And see *Angle v. Miss. and Mo. R. R. Co.* 9 *Iowa,* 487. In the case in 1 *Gray,* the defendants receipted the goods at a station on their line "for transportation to New York"— a point beyond their line. No connection in business was shown between them and any other railroad company. The defendants were accustomed to receive pay only over their own road. The goods in question were delivered to a connecting line, but only a portion of them reached New York. The defendants were held not liable, on the ground that their undertaking was to carry over their own road only. Whether the receipt of freight by them for the whole distance would have affected their liability, may perhaps be an open question on the authorities. That circumstance has evidently been regarded as important in some cases.— See *Weed v. S. and S. R. R. Co.* 19 *Wend.* 537, *and Redf. on Railw.* 286 *and note*; but in *Hood v. N. Y. and N. H. R. R. Co.* 22 *Conn.* 1, the first carriers, who received payment for transportation over the connecting line, were regarded as having received it as agent only, and not as compensation for an undertaking by themselves to transport over such line.

In the present case it is not shown that any connection in business exists between the defendants and the Cincinnati, Hamilton and Dayton Railroad Company. It is admitted that the latter company "is one of those forming a transportation route from Cincinnati to the city of

Detroit"—but this would be true whether the companies had business connections or not. It does not appear that the freight was paid, and the contrary is inferrible. It does not even appear that the charges agreed upon were for the whole route; and if they were, the case, I think, would not be affected by that circumstance. The only consequence would be to make the whole freight payable to the defendants, who would deduct their own charges and pay over to the Ohio company what remained. Fixing upon the price would only amount to an agreement by the Ohio company that the whole charges should not exceed that sum. In the absence of agreement between the two companies on the subject, the defendants would not be compelled to conform their own rates to those agreed upon at Cincinnati.

On this record as it stands, I think we must hold that the bills of lading given at Cincinnati were fully complied with when the Cincinnati, Hamilton and Dayton Company had carried the goods to Toledo and there delivered them to the defendants. If there is any exception to this statement, it must relate to the rates of freight; but even as to those, the undertaking of the Ohio company would not bind the defendants unless authority to bind them was shown. As there is no evidence on that point, I think the defendants received the goods at Toledo to be carried to Detroit under their liability as carriers at the common law, and with the right to make such reasonable charges as their regulations may have prescribed. If reasonable charges over their own line would exceed the amount specified—and which would appear by the way bill—they might refuse to receive the goods except upon pre-payment; but if they received and carried them with a notification that certain rates only were to be charged for the whole transportation, they would doubtless be limited in their collection to that sum. But one company cannot possess power, arbitrarily and in the absence of consent to fix the

rates for transportation by another, on the ground solely that the two form a continuous line between two points. It must be equally without power to make contracts diminishing the common law liability of the other; inasmuch as all such contracts must be based upon a consideration, which only the party himself or his agent duly authorized is competent to agree upon. If the bills of lading in terms applied to the carriage for the whole distance, we should be required to hold, I think, that the defendants adopted their terms and consented to be bound by them when they received and carried the goods under them; but I have already said that such is not the case in respect to the particular bills now under consideration.

I think, therefore, that the defendants should be held liable for the wine, candles and tobacco shipped from Cincinnati, unless the plaintiffs had been duly notified of their receipt at Detroit, and had had reasonable time after notice to remove them before the fire had occurred. It is admitted that no notice was given of the receipt of the wine and candles, but of the arrival of the tobacco the plaintiffs were notified about half past 3 o'clock in the afternoon of the 26th of April. The defendants were in the habit of closing their depot at 6 P. M. The fire occurred on the same evening. I am of opinion that a reasonable time was not afforded for the removal after the notice. It might not be proper to attempt to lay down any general rule as to what shall constitute reasonable notice in these cases, where the record discloses so little which bears upon the point; but it seems quite clear to my mind that two hours and a half are not sufficient, especially in view of the notice which defendants give to consignees—that they will charge for storage after twenty-four hours—which may possibly have led to a general impression that the relation of warehousemen was not to be considered as established until the expiration of that time. I think, therefore, the plaintiffs should have judgment for the value of the tobacco also.

McMILLAN ET AL. v. M. S. & N. I. R. R. Co.

For the eggs delivered to the defendants at Adrian and Hudson, under an exemption from liability for losses in consequence of fire in the depot, the defendants cannot be held liable under the principles hereinbefore stated.

CHRISTIANCY J. concurred.

CAMPBELL J.

The first question to be considered is whether the liability of the defendants is to be measured by their own charter, or by the General Railroad Law. The charter of the defendants does not provide for their extending their business to Detroit. And, although the general law contemplates that different roads may make consolidating arrangements which will reserve to them their chartered powers (§ 1994), yet that is not to be done by a mere lease. And where a road is held under lease, I think that the lessee must find his powers and responsibilities in the law which governs the leasehold property, and not in his personal or corporate capacity independent of that law. Had the charter of defendants contemplated such a lease, the case might be different; but as matters now stand, the only power to run this road at all is derived from the general law under which it was organized, and the franchises can not be measured by any other standard. Those who exercise the privilege must bear the burden.— *Gardner v. Smith*, 7 *Mich.* 410.

The question then arises, whether the liability of the defendants for goods in warehouse awaiting delivery is that of warehousemen or carriers. If they are carriers only, then nothing but a contract can change their liability, as the statute is very plain in its prohibition against any limitation depending entirely on their own will.— *Comp. Laws*, § 1992. We must therefore endeavor to determine whether the office of these corporations changes, at any time, from

that of carriers to that of warehousemen, and, if so, when the character shifts.

The authorities upon this subject are not in harmony. In those cases where the precise point has arisen we find that in Indiana, Illinois, Iowa, Massachusetts and Pennsylvania, the decisions are direct that the liability of carrier ends and that of warehouseman begins, as soon as the property is placed in the warehouse. In New Hampshire and Wisconsin it is decided that the special liability of a carrier continues until notice, and until time has been given for removal. Beyond this the doctrine either way rests upon *dicta*, or upon analogies which are drawn from other kinds of carriage. Having no direct adjudications of our own, we are compelled either to rest upon the weight of these authorities, or to investigate their respective merits. The text writers cannot very safely be cited as authority upon such a dispute, where the law is so recent; and if they could be, it cannot be denied that they are very far from speaking decisively. I think the preponderance of direct authority is very clearly in favor of the defendants. I am not inclined to regard this ruling as so absolutely settled as to preclude further inquiry. But I think the predominating rule is most in harmony with the course of business, and with the reasons which underlie the whole law of bailments.

It is now too late to discuss the propriety of the severe liabilities imposed upon carriers. They · rest in my judgment much more strongly upon law than upon reason. But this would not justify us in refusing to apply them to all cases coming within the fair scope of such employment. Yet, when the question arises whether these liabilities should be extended to cases not analogous in all their features, the nature of the differences must have a material bearing upon the decision; and the reasons of the old law may fairly be regarded, so that their applicability or inapplicability may have some weight in determining the result.

McMILLAN ET AL. *v.* M. S. & N. I. R. R. Co.

The original rule applicable to carriers is generally said to have arisen from the facilities offered to such persons, when away from their employers, of combining with thieves to steal the goods entrusted to them.   This rule originated when the business was carried on upon a small scale, and was altogether in private hands.   It is manifestly inapplicable to any of the extensive systems of land and water carriage, which have now superseded most of the smaller enterprises on our great thoroughfares.   As soon as business requires the employment of more extensive agencies, it becomes of the utmost importance to the proprietors of freight lines to pay great heed to their servants, for they always have interests of their own, which need care and guardianship quite as much as those of their customers, and which furnish quite as many inducements and chances for dishonesty.   The common law, however, took no heed of these things, and applied the same indiscriminate rules to all common carriers; and we are compelled to hold that so far as risks are concerned, such carriers are under the same rigid rules, except so far as they have been changed by statute.   The tendency of modern legislation has been to remove some of these oppressive burdens, but there has not been, in this state at least, any change in favor of railroads.   But, while this is so, the law relative to warehousemen also remains as it was, and those who perform their functions can not be held to any greater diligence than is demanded in the exercise of ordinary care.   There is no principle of law which, on account of this difference of liabilities, favors the existence or continuance of one relation in a given case rather than the other.   Each is as lawful as the other, and there can be no propriety in continuing either of the responsibilities longer, or beginning it earlier, than if there was no difference in the measure of care required from both.   The character of the business done should determine its appellation.

One of the chief sources of confusion in the law, upon such questions as those now before us, arises from a failure to perceive that uniformity in the degree of diligence required of carriers does not draw after it uniformity in the mode of doing business. The mode of receiving goods for carriage, and of disposing of them when the carriage has been completed, differs in the different kinds of carriage. It is very true that delivery has been sometimes loosely said to be one of the incidents necessary to complete the contract of carriage at common law. . But it is one of those sayings which has very little reason to sustain it. It was never true except in regard to that species of carriage conducted by means of wagons and other wheeled vehicles on land, or by yet more humble means, which in modern times, at least, is of very trifling importance compared with the immense business conducted by water, and upon vehicles which cannot be brought to every man's door. No court has assumed to hold that in those cases where delivery was impossible or unreasonable there is any uniform usage, and any attempt to create one, except by statute, must be somewhat arbitrary. It is therefore generally agreed that each business will naturally have its own usages, and that all persons dealing with carriers must deal with them upon that understanding.

It is a matter which must be considered as universally known, that railroads cannot deliver freight unless by making arrangements distinct from the regular conveniences of their cars and track. Our statutes require us to take notice that these corporations are expected to have warehouses and depots, and they are authorized to use the right of eminent domain to secure them. We are bound to know that goods must be placed in these warehouses in order to enable the roads to do business at all with security to their customers. If they have no such depositories of their own, they must place their goods in

the warehouses of some one else, as is very generally done on state railroads. Upon the facts found in the cases before us, it appears that defendants have warehouses of their own, and that all parties are expected to call at these places for their goods, and that plaintiffs have been in the habit of doing so. The simple question is whether these parties who are lawfully expected to have warehouses as well as cars, and who, it is admitted on all hands, may be warehousemen as well as carriers, become such as to all warehoused goods awaiting delivery, or only as to a part.

The ground on which it is claimed that their liability as carriers continues after warehousing, is that until notice has been given of the arrival of the goods, and until sufficient time has elapsed for removing them, the carrier's duty is not performed. It is somewhat difficult to determine the source of this proposition, although it has often been laid down. It is usually said to be a substitute for delivery. But I think the authorities to which allusion has already been made are correct in holding that this idea is fallacious. Delivery is something to be done to the property itself, and concerns it as much as any other part of the carriage. It is in other words the deposit of the property at its place of destination, and is therefore attended, until complete, with the same risks attached to its transit. Where delivery at one place — as at the premises of the owner — is impossible, then the natural substitute would be its deposit in some other safe place which is accessible; and this would, upon all principles of analogy, complete the functions of the carrier as such. And if notice is required, it would, therefore, be more consistent to treat it, not as a part of the unfinished duty of the carrier, but as informing the parties concerned that he had done his part, and they must look after their own property. And if this is so, then all the carrier can be expected to do will be to deposit

his load in a proper, safe and commodious place, such as persons generally are willing to leave their property in for safe keeping.

That notice, although proper and customary, cannot be regarded as essentially incident to the continuing and extraordinary risks of the carrier, is, I think, a fair deduction from many considerations to be drawn from authority. In the first place, I think this a necessary conclusion from our own decision in *Michigan Central R. R. v. Hale*, 6 *Mich.* 243. It was held in that case that goods in warehouse must be regarded as waiting delivery before as fully as after notice, and that notice was not necessary to change the carrier into a warehouseman, although it was necessary, under the charter of the company, to justify any charges for storage. In the next place, there are numberless cases where notice is impossible or inconvenient, and where no authority requires it. And it need hardly be remarked that the law which holds carriers to so strict an account in other things, would never discharge them on mere grounds of convenience from the performance of any legal duty. I have met with no case which requires a carrier to give notice to any person not residing at the place of destination, or to any one not already known there, or to use any special diligence in hunting up consignees who are not found on ordinary inquiry. Where goods are deposited by carriers in their own warehouses, to be called for by consignees residing elsewhere, or to be forwarded, the prevailing doctrine requires no notice. Neither is it customary or required that carriers, either by land or water, who pass through different points on regular journeys, delay their business to give notice of the deposit of their way freight. And it is universally admitted that a custom to give or to abstain from giving notice is valid, and needs no such assent as is required from those whom it is sought to affect by departures from the strict liabilities of common

carriers.   This of itself is enough to show that it is no necessary incident of the contract of carriage, with or without delivery, for no usage of a company can, by its own force, limit these liabilities.

Some of the authorities dwell considerably upon the point that persons may be very willing to employ these carriers as such, and yet not be willing to accept their modified liability in another capacity.   But this is assuming the whole matter; for if the railroad occupies both grounds in performing its duties, then it cannot be said that it is not employed in contemplation of the change at the termination of the transit.   The one duty must be presumed to be as much contemplated as the other.

And it is certainly more in harmony with reason to measure their responsibility in all cases by the functions performed for the time being, than to import into one business the obligations of another.  If by law and usage they deal with goods when unloaded just as warehousemen deal, and are placed under the same circumstances, there is no sound reason why they should stand on any different footing.  If warehousemen are less strictly bound than carriers, it is because the law has determined that when property is in their custody it does not require any further measure of protection than that which has been settled upon by legal usage from the beginning; and there is no good reason for drawing lines between persons performing identical functions.   It must not be imagined that, by ceasing to remain liable as carriers, they cease to perform valuable services or to care for the property.  The warehouse business is one which deals with very nearly, if not quite, as much property as is handled by carriers.  It requires the employment of honest agents and vigilant watchmen.   The amount of care exercised in fact is fully as great as men exercise over their own possessions, and much of our most valuable commodities will be always found stored in these repositories, because they

are deemed especially safe. Carriers are allowed by contract to obtain the same immunities, and no one has ever regarded such contracts as unreasonable. And I can conceive of no rule more simple or more just than one which, in conformity with the general law of bailments, will hold railroads to be carriers when acting in ⁄the conveyance of goods, and warehousemen when holding them in store. If the warehouses were in other hands, and the custom of business was such as appears in this case, it could not be denied that the warehouse owners became liable as soon as the property reached their possession. This is the only practical test for determining when the duties shift, where the same company performs both, and it is the rule which we applied in the *M. C. R. R. v. Hale.*

It was suggested on the argument that the provisions in the charters of the Central and Southern roads were intended to be peculiar privileges, purchased of the state under special circumstances. This is a mistake. A large part of the charters passed at the same session, and at subsequent sessions, contain the same clauses; and where this is not the case the warehouse privileges are in some respects even more liberal in regard to restrictions on charges. I do not understand that these clauses were designed to introduce new privileges, or to do more than settle what may be regarded as a disputed principle of law. And a rule which will produce uniformity, and cannot, under these circumstances, be regarded as against public policy, ought to prevail. It is at once simple, certain, and intelligible; while the other rule is not uniform in its application, and is open to endless difficulties concerning reasonableness of time as well as ability to give notice, and does not, in my judgment, conform to the analogies of business.

Upon the other questions raised in the case, I do not deem it necessary to make any extended remark. I agree

with my brother Cooley, that the liability of a common carrier can only be varied by contract, and that no notice, unless it has been so given as to authorize the implication of a contract, can avail. I am of opinion, however, as was intimated in *American Transportation Co. v. Moore, 5 Mich.* 368, that there is nothing in the nature of carriers which puts their contracts on any different footing from the contracts of other persons, or which prevents them from making any agreement which would be lawful if made by others. And inasmuch as the law of the land has expressly exempted them from liability for the misconduct of their subordinate agents on shipboard, I think it entirely competent to stipulate for the same exemption on land. There may be cases where it will be difficult to draw the line between responsible officers and subordinates, but in most cases it can easily be ascertained from the facts.

I concur entirely in the views of my brother Cooley upon the validity and effect of the several bills of lading, and also upon the question of freedom from responsibility for the fire.

But regarding the company as warehousemen in all the cases before us, I think all the judgments should be affirmed.

MARTIN CH. J. concurred.